UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

ROBERT WRIGHT et al.,                    :

                Plaintiffs,     :

      - against -                 :

HENRY J. STERN et al.,                   :

             Defendants.     :

- - - - - - - - - - - - - - - - - -x

**OPINION**

01 Civ. 4437 (DC)

**APPEARANCES:**   (see last page)

**CHIN, D.J.**

      In this action, plaintiffs allege that the New York City Department of Parks and Recreation ("Parks") violated federal, state, and city discrimination laws.  Plaintiffs, eleven African-American and Hispanic current and former Parks employees, allege that defendants engaged in a pattern and practice of employment discrimination on the basis of race, color, and national origin.  They allege also that defendants engaged in a pattern or practice of retaliation against employees who attempted to oppose the discriminatory practices.  Plaintiffs sue on their own behalf as well as on behalf of similarly situated individuals.

      Before the Court is defendants' motion for summary judgment dismissing certain class claims and certain individual claims.  As part of the motion, defendants also seek to exclude the reports and testimony of plaintiffs' expert witnesses, pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993).

Except to the extent set forth below, defendants' motion is denied, for plaintiffs have presented substantial, concrete evidence to support their claims of discrimination and retaliation. Plaintiffs' statistics, for example, show that in 2000, the year before this lawsuit was filed, 92.9% of the Parks employees earning less than $20,000 per year were African-American or Hispanic, while only 14.2% of those earning between $50,000 and $60,000 per year were African-American or Hispanic. Plaintiffs have also presented evidence of discriminatory remarks by high-ranking Parks officials as well as evidence of subjective and ad hoc employment practices that created roadblocks to advancement, including, for example, the filling of vacancies based on personal connections without posting or other public announcement. Plaintiffs have also presented evidence that Parks officials repeatedly retaliated against class members who complained of discrimination. Class members, for example, were denied promotions and raises after they complained. Indeed, two of the named plaintiffs were assigned to work in basements after they complained.

A reasonable jury could find from this and other evidence in the record that Parks engaged in widespread discrimination against African-American and Hispanic employees, in terms of promotions and compensation, and that Parks engaged in widespread retaliation against those who opposed what they believed to be discriminatory practices. I conclude, however, that plaintiffs have not presented sufficient evidence to sustain

their claims that defendants engaged in a pattern or practice of assigning employees and allocating funds based on race. Likewise, I conclude that plaintiffs have not presented sufficient evidence to support their hostile environment racial harassment claim.  Accordingly, defendants' motion for summary judgment is denied in part and granted in part.  Defendants' request for preclusion of the testimony of plaintiffs' experts is denied.

**BACKGROUND**

**A.   The Facts**

        Construed in the light most favorable to plaintiffs as the parties opposing summary judgment, the facts are as follows:

    **1.   The Parties**

        a.   **Plaintiffs**

        The named plaintiffs -- Carrie Anderson, Walter Beach, Jacqueline Brown, Angelo Colon, Paula Loving, Odessa Portlette, David Ray, Elizabeth Rogers, Henry Roman, Kathleen Walker, and Robert Wright -- are current and former Parks employees who are African-American or Hispanic.[1]

---

        [1]    As discussed in the decision certifying the class, plaintiffs inexplicably refer to non-class members as "Caucasian" even though this group includes Asian Americans, Native Americans, and others who do not identify themselves as White. See Wright v. Stern, No. 01 Civ. 4437 (DC), 2003 WL 21543539, at *1 n.1 (S.D.N.Y. July 9, 2003).  In contrast, Stephen Schneider, plaintiffs' expert, uses "Caucasian" to refer to White employees. (See, e.g., Schneider Report at 10 n.13).  As the class is now certified, I refer to employees who are not African-American or Hispanic collectively as "non-class members."  Where I use the
(continued...)

The named plaintiffs are long-time Parks employees, some of whom have been employed at Parks for as many as twenty-five or thirty years.  All but one (Beach) were denied promotions because they applied for positions and were rejected or they were unable to apply because the positions were not posted.  Eight of the eleven (Brown, Colon, Loving, Portlette, Rogers, Roman, Walker, and Wright) contend they were paid less and/or received fewer discretionary pay raises than comparably situated Caucasian employees.  Seven of the eleven (Beach, Brown, Colon, Portlette, Roman, Walker, and Wright) contend that after they complained of discrimination, they were subjected to adverse and retaliatory treatment.

### b.   **Defendants**

Parks is an agency of defendant City of New York (the "City").  (Compl.[2] ¶ 16).  Defendant Henry Stern, who was Executive Director of Parks in 1966, served as Commissioner of Parks during the Koch and Giuliani mayoral administrations, from in or about 1983 until 1989 and from 1995 until February 2002. (Stern Dep. at 38, 43, 49, 61).  Defendant Adrian Benepe has been the Parks Commissioner since February 2002.  Benepe worked at Parks as a seasonal employee for several years during the 1970s. After joining Parks full-time as an Urban Park Ranger in 1982,

---

[1](...continued)
term "Caucasian," I am referring to White employees.

[2]     References to "Compl." are to the Third Amended Complaint and Supplemental Class Action Complaint, filed on August 4, 2005.

Benepe served in a variety of positions before his appointment as Commissioner by Mayor Bloomberg.  (Benepe 12/23/05 Decl. ¶¶ 4-8). Stern and Benepe are sued in both their individual and official capacities.

 2.  **Parks**

  a.  **Overview**

   Parks is responsible for the care of more than 4,000 City properties, covering almost 29,000 acres of parklands, 7 public beaches, 993 playgrounds, 608 ball fields, 63 swimming pools, 36 recreation areas or senior citizen centers, 17 golf courses and driving ranges, 6 ice skating rinks, 5 major stadia, more than 500 tennis courts, 22 historic house museums, hundreds of statues and monuments, and more than 600,000 street trees. (Id. ¶ 2).  Parks' mission is to keep the City's parklands safe and clean, while also providing quality recreational opportunities to the public.  (Id. at ¶ 3).

   The Commissioner is responsible for the overall operation of the agency.  The Commissioner appoints Deputy, Borough, and Assistant Commissioners who are responsible for managing the agency divisions.  (Id. ¶ 9).  During Stern's term as Commissioner, the third floor of the Arsenal in Central Park served as the main headquarters for central management and high-level employees ("Arsenal Officials").  (Moss Dep. at 16-17, 202-04; Garafola Dep. at 52-53; Spiegel Dep. at 311).  In addition, each borough has its own headquarters and a management team, composed of a Borough Commissioner, Chief of Operations, and a

Deputy Chief of Operations.  (Benepe 12/23/05 Decl. ¶¶ 10, 25-26;
Stark Decl. ¶ 35; Stern Dep. at 66-67).

      **b.**   **The Workforce**

      Although the numbers fluctuated over time, Parks
employed roughly 3,400 to 5,000 full-time year-round employees at
a time during the period in question.  Some 2,000 to 4,000 were
formal year-round employees and some 1,400 to 1,600 were
"seasonal" employees who were paid from the seasonal budget but
worked year-round.  An additional 3,000 to 7,000 employees worked
on a seasonal basis only.  (Benepe Decl. ¶ 9; Schneider Report
Table C-1; Stark Dep. at 481-82, 486; Stark Dep. at 327-30; Stark
Decl. ¶ 22).  In addition, there are "seasonal step-up"
positions, which involve a year-round employee receiving a
temporary, seasonal promotion to a supervisory function.  (Stark
Decl. ¶ 24).  When an employee receives a seasonal step-up, his
regular salary is paid out of the full-time budget but the
temporary increment is paid out of the seasonal budget.  (Id.).

      Between January 1, 1997, and December 31, 2003, Parks
employed 6,295 full-time, year-round employees.  Of these, 15
were Native American, 227 were Asian-American, 1,163 were
Hispanic, 2,124 were African-American, 2,753 were White, and 13
were unknown.  (Schneider Decl. ¶ 13 (class members approximately
52.2%; White 43.7%); cf. Stark Decl. ¶ 3 (48% class members)).

### c.   **Employment Classifications and Regulations**

The terms and conditions of employment at Parks are subject to both the civil service structure and the union contracts in place in New York City.  (Stark Decl. ¶ 6).  As of December 2005, 94.3% of full-time Parks employees were unionized. (Id. ¶ 12).  Each union contract sets salaries, including minimum and maximum salaries where applicable, and provides for non-discretionary salary increments.  (Id. ¶ 14).  Employees covered by unions work in non-management positions.  (Terhune Dep. at 44).  For managerial employees, compensation is determined by the "Managerial Pay Plan," which sets minimum and maximum salaries for employees at eight assignment levels.  (Stark Decl. at ¶ 16). The Mayor's Personnel Order sets forth revision to those salaries.  (Id.).

Under the New York State Constitution, all public employees are "civil service" employees.  (Id. ¶ 7).  There are 220 civil service job titles at Parks, 184 of which are actively held by Parks employees.  (Id. ¶ 8; Schneider Decl. ¶ 15).  One position, "Commissioner," is "unclassified," and all other positions are "classified."  Classified service is divided into four classes -- exempt, non-competitive, labor, and competitive, with "[t]he majority of titles . . . in the competitive class." (Stark Decl. ¶¶ 8-9).  Employees in different classes are subject to different terms of employment with exempt and non-competitive classes serving at the will of the appointing officer.  (Id. ¶ 10).

Under civil service law, appointments and promotions of employees in the competitive class are to be made either permanently from a civil service list of employees who have passed an examination or, where no employees are on the civil service list, by provisional appointment.  (Stark. Decl. ¶ 10).[3] The Parks Working Conditions Agreement, which was in force during the times relevant to this lawsuit, provides that provisional promotions shall be made by seniority.  (Pl. Dep. Ex. 42 ¶ 7; Stark Dep. at 337-38).

For most or all of Stern's term as Commissioner, city-wide examinations were not given for a number of positions.  From at least as early as 1995 until 2000 or 2001, the City did not administer civil service examinations for the title of Park Supervisor, Principal Park Supervisor, Associate Park Service Worker, Urban Park Ranger, Recreation Assistant, and Recreation Supervisor.  (Def. Resp. Pl. RFA ## 258-59, 277-78, 280-81).[4]  As a result, employees in the competitive class frequently served on a provisional basis, which allowed them to advance without

_____

[3]     Under Department of Citywide Administrative Services rules, provisional appointments are limited to nine months. According to David Stark, the Chief Fiscal Officer of Parks, all city agencies ignore this rule because "if anyone upheld that rule, twenty-six thousand people would be terminated in the city."  (Stark Dep. at 332-33).

[4]     After a lawsuit was filed in New York Supreme Court alleging that Parks unlawfully employed employees in provisional positions beyond the eleven-month cap, the positions of Principal Park Supervisors and Park Supervisors were merged into the title Supervisor of Parks Maintenance and Operations.  A Civil Service test was conducted for this position.  The majority of those who passed the test were non-class members.  (Def. Resp. Pl. RFA ## 260-61, 270).

passing a civil service examination.  (Terhune Dep. at 154;
Lawless Dep. at 291-92).

In addition to civil service titles, Parks uses "in-house" titles for its employees.  Typically, in-house titles are more descriptive of the employee's actual role and responsibilities at Parks.  (Terhune Dep. at 133-35).  Though there may sometimes be a correlation between certain in-house titles and civil service titles, there is no Parks document setting forth which in-house titles correspond to which civil service titles.  (Id. at 143-48).

### 3.   **Evidence of Discrimination**

In support of their claims of discrimination, plaintiffs have offered evidence of: (a) statistical imbalances, (b) discriminatory comments purportedly made by Stern and other Parks management officials, (c) displays of nooses, (d) discriminatory practices in awarding wage increases, (e) discriminatory practices in promotions, postings of vacancies, and the interview process, (f) the discriminatory nature of the "Class Of" program, and (g) discriminatory decisions regarding assignments, funding, and staffing.

### a.   **Statistics**

In terms of salary, plaintiffs' statistics show a significant disparity, as the lower-paid positions are overwhelmingly held by class members while class members hold only a small percentage of the higher paid positions.  For

example, class member composition by income group in 2000 was as
follows:

| Salary | Percentage Class Members |
|--------|--------------------------|
| Less than $ 20,000 | 92.9% |
| $20,000 - $30,000 | 68.8% |
| $30,000 - $40,000 | 54.3% |
| $40,000 - $50,000 | 30.2% |
| $50,000 - $60,000 | 14.2% |
| $60,000 - $70,000 | 20.7% |
| $70,000 + | 13.3% |

(Schneider Rebut. App. Table A-6; Ex. ETH-00001; see also Pl.
Dep. Exs. 64 & 186).[5]  Likewise, controlling for job title, class
members were paid between $16.44 and $32.59 less than Caucasian
members on a bi-weekly basis between 1997 and 2003.  (Schneider
Rebut. Table 2).  Without controlling for job title, class
members were paid from $283.25 to $364.09 less than Caucasians on
a bi-weekly basis over the same time period.  (Id.).

      With respect to pay growth from a starting salary of
$30,000 in January 1997, the salaries of Caucasians increased, on
average, at a 4% higher rate than class members' salaries.
(Schneider Rebut. Table 4; App. Table A-14).  Similarly, Stern
and Benepe recommended salary increases 2.5% greater for non-
class members than for class members.  (Schneider Report ¶¶ 72-
73).  Moreover, non-class members received significantly higher

---

      [5]   While the numbers varied slightly from year to year,
the numbers for 2000 -- the year before this suit was filed --
are representative.

average salaries than class members for each year from 1996 to 2003.  For non-managers, the difference in salaries ranged from $6,909 in 1996 to, increasing steadily each year, $9,994 in 2003. (Schneider Rebut. App. Table A-9).  For managers, the difference ranged from $5,284 in 1996 to $7,957 in 2001 to $3,407 in 2003. (Schneider Rebut. App. Table A-8).

With respect to promotions, class members suffered statistically significant lower probabilities of receiving "wage promotions"[6] than Caucasians, controlling for job title, experience, and tenure.  (Pl. Mem. at 25; Schneider Rebut. Table 3 (ranging from 4.2 to 5.23 standard deviations)).  From 1996 until 2003, class members made up between 50% and 56% of the non-"Class Of" Parks workforce.  (Schneider App. Table A-5). Nevertheless, they constituted only some 18 to 23% of the managerial workforce from 1996 to 2001.  After the filing of this lawsuit, the number of class members in the managerial workforce increased to around 25% in 2002 and 2003.  (Schneider Rebut. Fig. 4, App. Table A-4).  A review of the in-house rosters shows that non-class members received 70.9% of the managerial in-house promotions from July 1995 to August 2004 while class members received 29.1% of those promotions.  (Schneider Rebut. Fig. 13). Though the parties dispute what constitutes a promotion, defendants' own records show 77% of promotions going to non-class

---

[6]    A wage promotion occurs when an employee's salary is increased by a specified percentage, for example ten percent. Schneider compared incidents of 5-10% wage increases, at 2.5% intervals, received by Caucasian employees and non-class members.

members in 1998 and 82% of promotions going to non-class members in 1999. (Pl. Dep. Ex. 85 (41 out of 53 promotions went to non-class members in 1998 and 53 out of 65 promotions went to non-class members in 1999)). As of February 2000, all 27 Principal Parks Supervisors were Caucasian and approximately 72% of Parks Supervisors were Caucasian. (Ex. ETH 0078).

Moreover, plaintiffs' expert Kathleen Lundquist, Ph.D., created a database containing overall panel interview scores for applicants for certain positions between 1995 and January 2004. (Lundquist Report at 12). The race of each applicant was tracked according to the DCAS database or the interview panel summary rating form. Based on her analysis of this database, Lundquist concluded that class members received statistically significant lower interview scores than Caucasians. (Id. at 12-13).

As EEO Officer, Lesley Webster met weekly with Stern and submitted investigation reports and status reports to Stern. Webster testified that she informed Stern that minorities were underutilized in Parks management positions. (Webster Dep. 280-86). Indeed, in January 1997, the City Equal Employment Practices Commission ("EEPC") issued a report finding significant underrepresentation of class members in numerous job titles and managerial titles at Park. (Pl. Ex. 67 at 7-9). Parks' reports to the EEPC for the years 1998-1999 contained a section describing the steps Parks would take to address the underutilization of women and minorities in certain positions. (See Pl. Dep. Ex. 89b-h).

    b.    **Comments**

        i.    **Stern**

        Stern's former employees describe him as "eccentric"
(e.g., Ricciardone 12/04/02 Dep. at 21) and a "combination of
Groucho Marx and Woody Allen" (Benepe DOJ Int. at 57), and there
is much in the record to support these characterizations.  For
example, Stern developed "Parks nicknames" for Parks employees,
which were included in the agency-wide manual and by which he
referred to employees, even during depositions.  (E.g., Def. Vol.
II, Ex. 24; Stern Dep. at 35 ("Gorilla" and "Gorilla Gorilla"),
135 ("Zorro"), 258 ("Igor"), 386 ("Home Boy")).  Various Parks
employees reported that Stern made fun of everyone, regardless of
race, including himself.  (Benepe DOJ Int. at 57-58; Castro DOJ
Int. at 81).  Stern prides himself on not being politically
correct.  (Stern Dep. at 250-54).

        From the evidence on the record, a reasonable jury
could find the following:[7]

        •    Stern said to Tanya Bowers, a former employee of
Parks who is Jewish and African-American, "It's wonderful, Tanya.
You look black, but when you talk, I know you're Jewish.  I can

_____

        [7]    Plaintiffs offer a statement purportedly made by Stern
in 1978 to a friend that African-Americans had "smaller brain
pans" and were therefore intellectually and genetically inferior.
(Newfield Dep. at 9-12).  Defendants argue that this statement is
inadmissible.  (Def. Reply at 15).  Defendants' objection is
sustained.  Assuming the statement was made, it is a classic
stray remark unrelated to any employment decision and was made
almost thirty years ago.

bring you home and know that the silverware will still be there
when you leave."  (Bowers Dep. at 203).

- Responding to a complaint of discrimination in
promotions forwarded from the Mayor's office, Stern asked the
complainant, Bernard Lewis, whether he was a drug addict or drank
on the job.  (Lewis Aff. ¶¶ 7-9).

- Stern attributes the lack of African-Americans in
managerial positions to the "smaller number of blacks who are
able to perform managerial positions."  (Stern Dep. at 150).  He
further explained that this was because of "background, because
they have not in a sense climbed the ladder."  (Id. at 150-51).

- Stern believed, as he testified, that class
members "racialized" conflicts with non-class member employees.
(Id. at 159).

- At a going away party for a Parks employee who was
leaving to attend Yale Law School, Stern said that he was
"pleased" the departing employee would be attending Yale "where
he could meet and rub arms with important people like the DuPonts
and the Rockefellers and also he could rub elbows with the quota
kids."  (Beach 4/3/03 Dep. at 196-97; Stern Dep. at 257-59;
Castro Dep. at 152-53 (testifying that he interpreted "quota
kids" as referring to African-Americans and Hispanics)).

- While walking with his dog, Boomer, Stern told a
group of Chinese children that "they could pet Boomer, but not
eat him."  (Stern Dep. at 33).  Stern described the incident as
"warm and affectionate" and "clearly a joke rather than a remark

denigrating anyone." (<u>Id.</u> at 33, 37).  Nevertheless, he
apologized when an adult complained about the incident,
clarifying that he had not meant to offend anyone.  (<u>Id.</u> at 36).

> •  Stern recommended that "Class Of" employees -- who
are recruited primarily from elite colleges through a program
described in more detail below -- read <u>The Bell Curve</u>, a book
describing purported differences in levels of intelligence among
racial groups.  (Bowers Dep. at  133-34).

Other Parks officials testified that they had heard
that Stern had a reputation for making racial remarks.  Castro
testified that he occasionally heard Stern use "racial
references" in a derogatory manner.  (Castro Dep. at 155).
Likewise, Moss admitted that Stern had a reputation for making
derogatory remarks.  (Moss Dep. at 148).

### ii.  **Other Parks Employees**

Plaintiffs also point to statements and conduct of
other Parks employees.  For example,

> •  Robert Garafola, a Deputy Commissioner under
Stern, wrote "incompetent people accusing racism" though he
admitted that he did not know all of the plaintiffs who had filed
lawsuits.  (Garafola 9/10/03 Dep. at 122-23).  Further, Garafola
admitted that there was merit in the statement that minorities
had been underrepresented in management and middle management at
Parks.  (<u>Id.</u> at 30; Garafola Dep. at 12/30/02 at 285).  Though
Garafola attempted to attribute this underrepresentation to few
minorities passing the required tests, he admitted that Parks

employees were promoted without taking civil service tests.
(Garafola 9/10/03 Dep. at 30-33).

- Charlie Cousins, a Caucasian Parks Supervisor in
Manhattan, said to class member Jose Cintron, "[Y]ou people are a
bunch of animals" in reference to the Puerto Rican Day Parade.
(Cintron Dep. at 48-49).  He also repeatedly referred to Cintron
as a "stupid spic."  (Id. at 56).  In the presence of Cintron,
Cousins also said to class member Richie Laylock, "you are a
stupid black Mother Fucker."  (Id. at 53-55).

- In March 1999, in a Brooklyn Parks facility, Greg
Dawson, Brooklyn's Deputy Chief of Operations, said to Henry
Roman, "[W]hat kind of Puerto Rican are you that you don't carry
a knife."  (Roman Dep. 9/4/02 Dep. at 73; Roman 1/16/03 Dep. at
213-14).

- Patricia Gracia, a Caucasian supervisor, muttered
"black bitch" under her breath when class member Arlene Dunbar
refused to sign a supervisory conference report dated August 15,
1998.  (Dunbar Dep. at 123-24, 139).

- Class member Dennis Moody heard that Phil Rabena,
a Caucasian Supervisor on Staten Island, asked an African-
American WEP worker named Montgomery to pull down his pants to
see if black men had larger penises than whites.  Moody learned
this from three workers who were present at the incident and the
WEP worker.  Verne Reilly, a Caucasian Parks Supervisor and EEO
representative on Staten Island, encouraged the WEP worker to

- 16 -

report the incident.  (Moody Dep. at 30-34; Pl. Dep. Ex. 537).[8]
Thereafter, Reilly informed Webster that he was concerned Rabena
would retaliate against him.  (Pl. Dep. Ex. 537; Webster Dep. at
620-22).  Indeed, Reilly was transferred shortly thereafter from
Staten Island, where he lived, to Harlem, purportedly for
disciplinary reasons.  (Reilly Dep. at 58).

●   In August 2001, Jack Bero, a Caucasian supervisor,
made a joke containing the phrase, "It's time to get the niggers
out of here."  (As Salaam Dep. at 88-89).

●   Following a catered special event at the Historic
House in the Bronx, Kathleen Walker overheard Commissioner Linn
say, "[I]f you give them maybe the bottles that are halfway open,
. . . maybe they won't steal the rest of the bottles."  (Walker
9/17/02 Dep. at 106).

### iii. Nooses

In 1998, a noose was found hanging from a pipe in the
Forestry Office in Staten Island.  (Webster Dep. at 315; Moody
Dep. at 124-28).  A picture of a black man was on the wall behind
the pipe so that the head of the man in the picture could be seen
through the opening of the noose.  (Moody Dep. at 124-28).  The
noose was removed after a Parks employee complained.  Though a
complaint was filed, it is unclear whether an investigation was
conducted.  No one was disciplined for hanging the noose.
(Webster Dep. at 315-16).

---

[8]   To the extent plaintiffs rely on Moody's testimony
regarding this incident, it is hearsay.  At trial, they must
offer evidence of a witness who heard Rabena make this statement.

In 2000, a noose was hung on a forestry truck in Queens. (Webster Dep. at 319-20, 688-90; Pl. Dep. Ex. 9). Webster testified that she "conducted an investigation[,] . . . found . . . that the noose was taken  . . . down, that they were not sure who put the noose up and how long it had been there, and that was it." (Webster Dep. at 320). Again, no one was disciplined. Webster did not refer either allegation to the City's Advocate's Office, and she was unable to specify whether she dealt with the nooses in subsequent trainings. (Id. at 320-22, 692).

Each October, between 1995 and 1997 or 1998, Susan Silvestro, a Caucasian supervisor, hung a noose in her office at Five-Boro on Randalls Island, apparently as part of a Halloween display. (Silvestro 4/15/03 Dep. at 180-81, 185; Portlette 8/26/02 Dep. at 89-90; Green Dep. at 124-36). Silvestro continued to display the noose even after an African-American employee complained. (Green Dep. at 125-36).

Stern acknowledged that he was aware that a noose was placed on Parks property in 1998 or 1999 and that McCoy had complained about it, but he did not know if Parks investigated it. (Stern Dep. 159-63). Stern explained that McCoy was of "limited capacity." (Id. at 160). Further, while he understood that nooses could be offensive to African-Americans, Stern did not order any investigation of the nooses on Parks property though he considered them "childish" and "silly." (Id. at 163-68). From January 1, 1995, until August 20, 2004, defendants did

- 18 -

not discipline any Parks employee for displaying a noose on Parks
property.  (Def. Resp. Pl. RFA #457).

### iv.  Wage Increases and Promotions

When an employee was recommended for a wage increase or
promotion, a Planned Action Report form ("PAR") was prepared
identifying the candidate and proposing an increase or promotion
but leaving a blank for the salary and Stern's signature.  (Stark
Dep. at 64-65, 69, 259-61, 274-81).  David Stark, who oversees
the Personnel Department as Chief Fiscal Officer of Parks, would
bring these forms to Stern, and together they would review the
proposed action.  (Id. at 273-74).  If Stern approved a request,
he would determine a salary and write it on the PAR form.  (Id.
at 221, 270-78; Terhune Dep. at 56, 65).  Generally, Stern did
not consult Civil Service law or collective bargaining agreements
in determining the salary.  (Stark Dep. at 276-78 (observing that
Stern filled in salary on PAR forms without consulting any
guidelines but also noting that Stern knew the salary structure
of the agency)).

After Stern approved a planned action and determined a
salary, Stark and Terhune would select a civil service title that
matched the salary selected by Stern.  (Id. at 285-89).  Thus,
the salary determined the civil service title the employee would
receive.  (Id.).  In some circumstances, employees would have
received a change in their in-house titles prior to a PAR being
submitted and approved.  These individuals, however, would not be

eligible for a salary promotion until the PAR was approved.  (<u>Id.</u> at 264).

In the case of year-round employees paid from the seasonal budget, the PAR would be implemented after Stern signed it.  (<u>Id.</u> at 288).  In the case of employees paid from the regular Parks budget, Stark and his associates would fill in the "justification" on the PAR after Stern set the salary and signed the form.  (<u>Id.</u> at 257-59, 288-89).  The completed PARs for these employees would then be sent to City Hall for approval.  (<u>Id.</u> at 293).

Stern had ultimate authority to approve or disapprove a job action.  (<u>Id.</u> at 270-78; Stern Dep. at 18).  In practice, he generally approved the action recommended by his subordinates though sometimes he did not approve salary increases at the level recommended by them.  (Stern Dep. at 18; Stark Dep. at 280-85).  The level of the raise was almost always determined by the Commissioner.  (Stark Dep. 276-68 ("I never knew what [number] he was going to put in there until he did it.")).

Stern said he did not want "to stigmatize" minorities by giving them a plus for diversity, but he nonetheless stated that all things being equal, he would give a slight preference to a minority to help to create diversity.  He could not think of an employee to whom he had given that benefit.  (Stern Dep. at 315-16).

### v. __Postings and Interviews__

The City of New York Affirmative Employment Plan for
1991 requires that Parks notify employees when job openings
occur.  (Pl. Dep. Ex. 3 at 5).  The City's Personnel Policy,
dated June 30, 1998, requires that vacancy notices be posted.
(Id. Ex. 45).  Likewise, the Citywide Contract, which applied to
Parks as of May 24, 1998, and the Parks Working Conditions
Agreement require that Parks post notices of job positions,
including promotional provisional vacancies, two weeks before the
positions are filled.  (Def. Resp. RFA ## 60-62; Pl. Dep. Ex. 42
at 2).  Since 1994, Stark has maintained a policy that all job
vacancies are to be posted.  (Stark Dep. at 83-88).

Despite these requirements and policies, Parks did not
have an official policy regarding the posting of vacancies and
regularly failed to post vacancies prior to the filing of this
lawsuit.[9]  (Terhune Dep. at 180, 405-06; Stark Dep. at 83-88).
Indeed, when the personnel department received notice of a
vacancy, Terhune would ask whether he had "the go ahead" to post
the position.  (Terhune Dep. at 406).  Between 1995 and March
1999, there were no postings for the following in-house
positions: Borough Chief of Operations; Chief of Recreation;
Chief/Director of Recreation; Deputy Chief of Operations;

---

[9]     As a term of the consent decree in the related action,
discussed below, Parks adopted a new policy for posting and
filling vacancies.  Parks increased the number of jobs it posted
after EEOC charges were filed.  (Garafola DOJ Int. at 271-72,
287).

Assistant to the Commissioner; and Chief of Staff.  (Def. Resp.
Pl. RFA # 74).  There were no postings for Principal Parks
Supervisor ("PPS") positions during 1995, 1997, or 1999 (Def.
Resp. Pl. RFA # 76), and the majority of the PPS positions
available during these years went to non-class employees.  (Ex.
ETH 00078).  Terhune counted 34 postings for 1995; 11 for 1996;
32 for 1997; 36 for 1998; 62 for 1999; 97 for 2000; 111 for 2001;
and 222 for 2002.  (Terhune Dep. at 442, 447, 449, 453, 456, 467;
Terhune 1/6/03 Dep. at 146, 165).  For at least some of these
years, many more promotions occurred than were posted.  (Pl. Dep.
Ex. 85. (at least 53 promotions in 1998)).

        Parks did not have any formal policy for selecting
employees for non-posted positions.  (Def. Resp. Pl. RFA # 232).
Promotions to managerial positions were sometimes made by Arsenal
Officials without the knowledge or input of Borough
Commissioners.  (Spiegel Dep. at 215-17, 237-39).  Further, it
was not unusual for Stern or other officials to personally choose
employees for seasonal step-ups.  (Terhune 1/6/03 Dep. at 34-37).

        Even when a position was posted, interviews were not
always held.  During the relevant time period, Parks did not have
a written policy regarding when interviews should be used to fill
vacant positions or how to determine which applicants should be
interviewed.  (Def. Resp. Pl. RFA ## 130-31, 144-45).  Sometimes
an interview would serve only as a formality; an employee
previously selected for a position would interview while other
employees would not be given the opportunity to interview.  For

example, in 1995, Wright approached Assistant Commissioner of
Recreation, Rosemary O'Keefe, to request a transfer to the Asser
Levy Center, a top facility in Manhattan, which had posted an
open position. (Wright 3/26/03 Dep. at 33-35). After making his
initial request, Wright was told that Asser Levy was no longer
available. In fact, Lynda Ricciardone, a Caucasian, had accepted
the position at Asser Levy. In contrast to Wright, however,
Ricciardone had not applied for the position or even been aware
of or had an interest in the position when the Manhattan Chief of
Recreation called her to offer her the position. (Ricciardone
Dep. at 91-98).

When interviews were conducted, the interviewers rated
the candidates and these ratings were then given to Garafola or
Moss, depending on the department in which the promotion fell.
(Stark Dep. at 611-12). Parks did not provide interviewers with
standard guidelines for conducting interviews, or instructions on
how to evaluate and rate answers or how to arrive at an overall
rating. (Def. Resp. Pl. RFA ## 194-95, 204). Parks did not have
a formal policy establishing what weight the interviewers' scores
would be given, and the person selected for promotion was not
necessarily the applicant with the highest interview rating.
(Id. RFA # 140; Stark Dep. at 614-15). Indeed, on one occasion,
a Caucasian applicant with the lowest interview scores was
selected over an African-American applicant with the highest
score. (Pl. Dep. Ex. 118 at 2).

In its January 1997 report, the EEPC required that
Parks review "[s]election, evaluation, and promotion
devices/criteria . . . to determine if they have a disparate
impact on protected group members."  (Pl. Ex. 67 at 12).  Between
the issuance of that report and the initial filing of this
action, Parks did not conduct a disparate impact analysis.  (Def.
Resp. Pl. RFA ## 237-38).  Between 1995 and August 2004, neither
Parks nor any other city agency has conducted any validity
study[10] regarding the interview processes used by Parks for
selection of candidates for job vacancies.  (Id. RFA ## 173,
181).

> The Uniform Federal Guidelines provide that
>
>> Where the user has not maintained data on
>> adverse impact as required by the
>> documentation section of applicable
>> guidelines, the Federal enforcement agencies
>> may draw an inference of adverse impact of
>> the selection process from the failure of the
>> user to maintain such data, if the user has
>> an underutilization of a group in the job
>> category, as compared to the group's
>> representation in the relevant labor market,
>> or, in the case of jobs filled from within,
>> the applicable work force.

(Lundquist Report at 6 (quoting Uniform Guidelines, Section 4D,
pp. 38297-98 (1978))).  Between 1995 and August 2004, Parks
failed to keep records: (a) of forms indicating ratings given to
interviewees; (b) of the numbers of applicants meeting minimal

---

[10]     "The current thinking in the field of Industrial
Psychology is that validity is the accumulation of evidence about
the appropriateness of the test (or in this case the interview
and minimum qualification selection procedures) as a measure of
job performance."  (Lundquist Report at 8).

qualifications for vacant positions; (c) identifying the
applicants accepted for interviews for posted jobs; and (d)
identifying who was hired as part of the "Class Of" program.
(Def. Resp. Pl. RFA ## 193, 223-24, 368).

Personnel practices did not change when Benepe became
commissioner.  (Terhune Dep. at 343; Benepe Dep. at 462).  Benepe
operated Parks under the same policies and practices as former
Commissioner Stern until around June 2005 when Parks entered a
consent decree with the United States Department of Justice
("DOJ") in the companion action, discussed below.

### vi.  The "Class Of" Program

In 1994, Stern created the "Class Of" program to
"expose recent college graduates to Parks and to city
government."  (Pl. Dep. Ex. 18 at 2).  "Class Of" employees were
recruited from colleges across the country, including many Ivy
League schools and similar elite, private institutions.  (Id.
Exs. 27 & 28).  The recruitment brochure promised that "[r]ecent
graduates who come to Parks work closely with senior officials,
learning from them on a daily basis," and "take on a high-level
of responsibility within the agency."  (Id. Ex. 18 at 2).
According to a "Class Of" employee quoted in the brochure,
recruits may be "considered for positions normally given to
individuals with more experience."  (Id. at 8).
Beginning in 1995, Parks hired between ten and more than forty
recent college graduates to work for the "Class Of" program each
year.  (Def. Resp. Pl. RFA # 314).  Though these employees worked

- 25 -

full-time on a year-round basis for Parks, Parks  paid the
majority of them from the seasonal budget and therefore they were
not included in Parks' headcount.  (Stark Dep. at 234-35; Def.
Resp. Pl. RFA ## 316, 321, 324).  Until August 2000, "Class Of"
employees were promised and received an approximate 20% raise
(roughly $5,000) following their first year of employment with
Parks.  (Pl. Dep. Ex. 24; Def. Resp. Pl. RFA # 326; Kay Dep. at
220-21).  Further, "Class Of" employees had first priority for
junior manager vacancies.  (Terhune 1/6/03 Dep. at 101).  Several
"Class Of" employees were assigned to work directly with Stern or
his deputies on the third floor of the Arsenal; these "Class Of"
employees were predominantly or exclusively non-class members.
(Stern Dep. at 264).

       Though Stern testified that there was a policy to hire
all minority applicants who applied to the program, the "Class
Of" recruiter testified that she had not been so instructed.
(Id. at 388-89; Kay Dep. at 49-50, 55).  The racial and national
origin composition of "Class Of" employees was approximately:
72.1% Caucasian; 6.3% Hispanic; 11.0% African-American; 0.4%
Native American; 7.4% Asian; and 2.8% Unidentified.  (Def. Resp.
Pl. RFA # 378).  Parks never conducted any analysis to determine
if Parks' method of recruitment, hiring, or selection of "Class
Of" employees had a disparate impact on African-Americans or
Hispanics.  (Id. RFA ## 369-71).

### vii. **Segregation, Underfunding, and Understaffing**

With the exception of the EEO officer, Webster, and one
or two class members who served in secretarial or administrative
jobs, all thirty to forty employees on the third floor of the
Arsenal were non-class members.  (Weizmann Dep. at 67-68; Moss
Dep. at 44; Sahl Dep at 191-92).  Noting the absence of class
member employees working at the Arsenal, Danny Weizmann, a "Class
Of" employee, described Parks as being run like it was a "private
club" for whites only.  (Id. at 69-71).

Benepe, as well as other high-level Parks personnel,
acknowledged that Parks sometimes assigned employees on the basis
of race and/or linguistic abilities to neighborhoods reflecting
that language or race because of demands from the neighborhood.
(Benepe 7/19/01 Interview at 46 ("It's true that we have placed
people by demand from a community, both implied and stated.");
see also Spiegel Dep. at 126-28; Ricciardone Dep. at 196-98).  As
an example of an implied request, Benepe noted that community
groups would ask that Parks' employees understand the needs and
interests of the community.  Beyond these requests, some
community groups would "be as bold as to say [someone] who looks
like us, who speaks our language, who belongs to our community."
(Benepe 7/19/01 Interview Tr. at 46-47).  Likewise, the recruiter
for the "Class Of" Program acknowledged that the "Class Of"
Program, at the request of supervisors, took race into account in
making assignments.  (Kay Dep. at 49-51).  Further, multiple
high-level Parks personnel noted that the staff of a facility

often reflected the racial composition of the area.  (Moss Dep.
at 40-41; Stern Dep. at 342-67).

Many class members worked in one or more boroughs where
they did not reside, and Terhune did not have a policy of
assigning people to locations near their homes.  (E.g., Wright
Aff. ¶¶ 1-3; Lewis Aff. ¶ 2; Clark Aff. ¶ 3; Henry Aff. ¶¶ 1-2,
5; Terhune Dep. at 293).  At least some class members indicated
that they would not mind moving work locations or working outside
the borough in which they lived if it would facilitate their
advancement at Parks.  (Jacobs-Pittman Dep. at 174-75; Wright
3/26/03 Dep. at 33-35; Brown 1/3/03 Dep. at 216).

All named plaintiffs and additional class members
observed that the Parks workforce was geographically segregated
by race or national origin.  (See Pl. Additional Facts at 29 #17-
18 (collecting citations)).  Throughout the relevant time period,
the few African-American and Hispanic Park and Recreation
Managers and Center Managers were assigned to predominantly
African-American and Hispanic neighborhoods.  (Wright Aff. ¶ 12;
Henry Aff. ¶ 2;  Ex. G00616-620; Ex. G00905-953; Ex. REC000072-
73).  Conversely, Parks' facilities and districts in non-African-
American or Hispanic neighborhoods were supervised and managed
almost exclusively, if not exclusively, by non-class employees.
(Wright Aff. ¶ 12; Roman Dep. at 57-58;  Ex. G00616-620; Ex.
G00905-953; Ex. REC000072-73).  Indeed, when Beach recommended
certain class members for a Center Manager position at a pool in
Williamsburg, Brooklyn, a predominantly Caucasian neighborhood,

the Borough Commissioner informed Beach that he and Garafola
would make the decision, a step the Borough Commissioner had not
taken with any other Center Manager promotion Beach had made.
(Beach 4/3/03 Dep. at 156-65 (noting that he had unilaterally
selected employees for Center Manager positions in the past);
9/29/02 Dep. at 109).  Similarly, African-American and Hispanic
supervisors have supervised predominantly African-American and
Hispanic crews.  (Wright 9/12/02 Dep. at 65; Beach 9/29/02 Dep.
at 108-09).

Multiple class members testified that many facilities
and parks in predominantly African-American and Hispanic
neighborhoods were in disrepair and underfunded and understaffed
by Parks.  (See, e.g., Anderson 9/5/02 Dep. at 80-83; Brown
8/28/02 Dep. at 75-78).  Stark testified that there are no
documents reflecting the budget allocation or funding of
individual centers, and Parks does not conduct a cost analysis
for each park.  (Stark Dep. at 304, 681).

### 4.   Evidence of Retaliation

When Webster, who has served as Parks EEO Officer since
1995, began in the position, no one told her what her functions
were.  (Webster Dep. at 393-95).

In 1996, the City issued a report card on City
agencies' discrimination complaint and investigation practices.
(Pl. Dep. Ex. 66).  The report noted that Parks'

- 29 -

> EEO officer[11] expressed a preference for the
> "quick solution" approach to resolving
> complaints of discrimination, which is
> evidenced in the majority (93%) of the 15
> formal complaint files available for review
> . . . . Complaints involving serious
> allegations of race discrimination, sexual
> harassment and retaliation were resolved
> within one to two days and often did not
> reflect any components of the Plan's
> investigation procedures had been performed
> . . . The file displays an apparent
> misunderstanding that race discrimination
> laws may be violated even while civil service
> laws and rules have been complied with.

(Id. Ex. 66 at 11-12).  Commenting on the poor record-keeping at

Parks, the report further observed that the summaries of the

complaints and investigations "appear to have been written up for

purposes of our review."  (Id. at 12).

Many class members did not feel comfortable filing

complaints with the EEO Office.  (Anderson 9/5/02 Dep. at 106-08;

Brown 8/28/02 Dep. at 102-06; Roman 9/4/02 Dep. at 99-102; Walker

9/17/02 Dep. at 94-100; Wright 9/12/02 Dep. at 107-110).

Anderson explained that "most blacks and Latinos [who] work in

the agency do not go to Leslie Webster, because she wasn't going

to do anything about it."  (Anderson 9/5/02 Dep. at 107-08).

Those who did file complaints did not feel that Webster took

those complaints seriously.  (Cintron Dep. at 114 (she seemed

incompetent); Beach 4/3/03 Dep. at 118-24 (never responded to his

allegations); Brown 8/28/02 Dep. at 102-05).

---

[11]    It is unclear whether the report card refers to Webster
or her predecessor.  Though the report was issued after Webster
had assumed the EEO Officer position, the complaint refers to the
Officer as a "he."

Employees who filed complaints were at least sometimes left in the dark regarding the outcome of those investigations or the basis for the outcome.  In a 2001 report, the EEPC observed that notices to parties did not state explanations for the EEO's decision.  In a survey conducted by the EEPC, seven of eleven respondents indicated that they did not receive written notification of their complaints.  (Pl. Dep. Ex. 78 at 4-5).  Webster was not aware of a single case where anything beyond a supervisor's conference was sought.  (Webster Dep. at 603-05).

Approximately thirty separate Parks employees filed retaliation complaints with agencies outside of Parks between 1995 and 2003 -- seven named plaintiffs brought individual retaliation claims, and between twenty and twenty-five claims were filed by other Parks employees.  (Def. Ex. 37).

Multiple class members, including Brown, Colon, Portlette, Roman, Walker, and Wright, indicated they were denied promotions and/or salary increases after filing complaints. Additionally, Portlette was moved to a basement office after filing her complaint and Wright's pay was cut when he was promoted.

Various class members testified that Parks officials either implicitly or explicitly indicated Parks' disapproval of the filing of discrimination complaints.  In 1997, Webster told Brown that complaining was frowned upon by the agency.  (Brown 8/28/02 Dep. at 103-05).  In 2001 and 2002, Colon's supervisor, Christopher Caropolo, repeatedly conditioned any salary increases

on the termination of this lawsuit.  (Colon 9/9/02 Dep. at 7-8;
Colon 4/17/03 Dep. at 27-35).  After filing charges with the
EEOC, Roman was informed that his request for a transfer to
Staten Island would be approved if he withdrew his claims.
(Roman 1/16/03 Dep. at 173-74; Pl. Dep. Ex. 438).  Benepe told
Wright that he should not file EEOC charges to avoid "any bad
feelings."  (Wright 9/12/02 Dep. at 122-23; Wright 3/26/03 Dep.
at 155-57).

B.    **Prior Proceedings**

        Plaintiffs filed charges of discrimination with the
Equal Employment Opportunity Commission (the "EEOC") beginning in
March 1999.  The same year, the United States Department of
Justice ("DOJ") commenced its own investigation into plaintiffs'
claims.  On January 30, 2001, the EEOC issued a Determination,
amended on March 14, 2001, finding reasonable cause to believe
that Parks engaged in a pattern and practice of racial
discrimination through its promotions and assignments, and
referred its findings to DOJ.  Specifically, the EEOC concluded
that:

> The evidence of record shows that since 1997
> a greater proportion of Caucasians were
> placed in permanent positions in at least six
> (6) out of eight (8) categories where
> permanent positions were offered.  In
> comparison, African American and Hispanic
> employees filled a higher percentage of
> provisional, seasonal, non-competitive and
> labor class positions in twelve (12) out of
> sixteen (16) job categories.
>
> The record also shows that the promotion
> ratios for Hispanics and Blacks do not

correspond with the entire workforce profile
ratios.  For example, for fiscal years 1998
and 1999, 70% of the employees given
promotions were Caucasian while only 50% of
Respondent's workforce was Caucasian.  In
contrast, in 1998 and 1999, respectively[,]
Blacks got 17% and 11% of promotions while
representing the workforce[12] and Hispanics
got 1.5% and 11% [of promotions] while
comprising 16% of the workforce.

Examination of the evidence further reveals
that Respondent's supervisory lines of
authority are almost completely segregated by
race and color.  The investigation has
revealed that all of the managers and
directors at the Recreation Centers are
Caucasian.  The investigation also uncovered
that almost no Caucasian employees report to
minority supervisors.

Based on the above, there is reasonable cause
to believe that Respondent has unlawfully
discriminated on the basis of race and
national origin through promotion and
assignment.  The investigation also reveals
that certain individuals were retaliated
against for attempting to protect their
rights as employees under Title VII. . . .

(First Am. Compl. Ex. 3).

        Plaintiffs commenced their lawsuit on May 24, 2001.  On

June 19, 2002, the United States filed an action against the City

and Parks alleging a pattern and practice of racial and national

origin discrimination in promotional decisions.  By order of this

Court dated July 15, 2002, the two cases were consolidated.

Following extensive discovery, I certified the class by

memorandum decision dated July 9, 2003.  Wright v. Stern, No. 01

Civ. 4437 (DC), 2003 WL 21543539, at *1 n.1 (S.D.N.Y. July 9,

---

        [12]   The amended determination omits the percentage of the
workforce made up by African-Americans.

2003).  On June 8, 2005, DOJ and Parks entered into a consent decree in which Parks agreed to implement certain personnel practices, and the DOJ action was closed.

On August 4, 2005, plaintiffs filed their Third Amended Complaint, in which they assert pattern or practice and individual disparate impact and disparate treatment claims based on alleged failures to promote and compensate, segregation in work assignments, discriminatory allocation of resources, and discouragement of the filing of discrimination claims. Plaintiffs further assert a pattern or practice hostile work environment claim.  Finally, plaintiffs assert pattern or practice and individual claims that Parks retaliated against class members who filed complaints.[13]

This motion followed.

## DISCUSSION

Defendants move to exclude the reports and testimony of plaintiffs' experts and for summary judgment on the class claims and most of the individual claims.  First, I address defendants' Daubert challenges.  Second, I discuss defendants' motion for summary judgment dismissing the various class claims.  Third, I

---

[13]     Plaintiffs also purport to assert "First Amendment" and "Freedom of Speech" claims.  (Compl. pp. 66, 69).  Plaintiffs do not appear to be pursuing these claims, which, in any event, are more properly treated as retaliation claims.  Accordingly, the "First Amendment" and "Freedom of Speech" claims are dismissed, without prejudice to plaintiffs' retaliation claims under the employment statutes.

discuss defendants' motion for summary judgment dismissing the individual claims.

## A.   **Plaintiffs' Expert Witnesses**

Plaintiffs rely on the testimony of three expert witnesses, as follows:

Dr. Donald Tomaskovic-Devey, who holds a Ph.D. in Sociology, is a Professor of Sociology at the University of Massachusetts and the former Director of Graduate Programs of Sociology at North Carolina State University.  He has served as an expert in numerous employment discrimination cases. Additionally, he served as a consultant to DOJ for cases involving automobile stops.  His research focuses primarily on gender and racial workplace inequality and organizational research methodologies.  (T-D Report[14] at 2; Pl. Mem. at 73). Dr. Stephen Schneider, who holds a Ph.D. in Business and Applied Mathematics, has served as an expert in multiple federal actions, including actions involving employment discrimination and wage and hour dispute cases.  (Schneider Report at 1-2).  Dr. Kathleen Lundquist, who holds a Ph.D. in Psychology, has extensively researched, designed and conducted statistical analysis, and provided consultation in the areas of job analyses, test validation, performance appraisal, employment testing, and research design.  She has served as an expert on testing and

_____

[14]    References to "T-D Report" and "T-D Rebut." are to the report and rebuttal report of Tomaskovic-Devey.

validation for both the U.S. Department of Labor and the DOJ. (Lundquist Report at 2-3).[15]

Defendants move to preclude these experts from testifying, and argue that their reports are so flawed that the Court may not consider them in ruling on defendants' motion for summary judgment.  I discuss the law governing the admissibility of expert reports and then apply it to the reports here.

### 1.  **Applicable Law**

A witness qualified as an expert will be permitted to testify if his or her testimony "'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702).  To be admissible, expert testimony must be both relevant and reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

To be reliable, expert testimony must be based on sufficient facts or data, and it must be the product of reliable principles and methods properly applied.  Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003).  The trial court's task

---

[15]    Defendants offer their own experts.  Dr. Catherine S. Cline holds a Ph.D. in Psychology and has worked for twenty-five years in the areas of job analysis and test construction.  (Cline Report at 2-3).  Dr. Christopher Erath, who holds a Ph.D. in Economics, is Senior Vice President at National Economic Research Associates in Boston, Massachusetts.  (Erath Report at 1).  Dr. Christopher Winship holds a Ph.D. in Sociology from Harvard University, where he serves as the Norman Tishman and Charles M. Diker Professor of Sociology.  (Winship Report at 1-2).

> is to make certain that an expert, whether
> basing testimony upon professional studies or
> personal experience, employs in the courtroom
> the same level of intellectual rigor that
> characterizes the practice of an expert in
> the relevant field.

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  In other words, expert testimony should be excluded if it is "speculative or conjectural," or if it is based on assumptions that are "'so unrealistic and contradictory as to suggest bad faith.'"  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984)).  An expert's opinion is inadmissible if it "is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The trial court has latitude in deciding how to test an expert's reliability.  Daubert listed a number of factors, but this "list of factors was meant to be helpful, not definitive." Kumho Tire, 526 U.S. at 151.  Hence, factors that a trial court may consider include, among others: whether a theory or technique relied on by an expert can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether there is a known or potential rate of error; whether the theory or technique has been generally accepted in the relevant community; whether the discipline itself lacks reliability; where an expert's methodology is experience-based, whether the methodology has produced erroneous results in the past and whether the methodology has been generally accepted in the relevant community; and whether an expert's method is of a

kind that others in the field would recognize as acceptable.
Daubert, 509 U.S. at 593; Kumho Tire, 526 U.S. at 151.

In addition to being reliable, expert testimony must be
relevant.  An expert opinion is relevant if it "will assist the
trier of fact to understand the evidence or to determine a fact
in issue."  Fed. R. Evid. 702; see Daubert, 509 U.S. at 591
("This condition goes primarily to relevance.").  Ultimately, an
expert's role is to assist the trier of fact by providing
information and explanations.

The proponent of expert testimony must establish its
admissibility by a preponderance of the evidence.  See Astra
Aktiebolag v. Andrx Pharms., Inc., 222 F. Supp. 2d 423, 487
(S.D.N.Y. 2002) (citing Fed. R. Evid. 104(a) and Bourjaily v.
United States, 483 U.S. 171, 175-76 (1987)); Fed. R. Evid. 702
advisory committee's note (2000 Amendments) ("[T]he proponent has
the burden of establishing that the pertinent admissibility
requirements are met by a preponderance of the evidence.").
Rejection of expert testimony, however, is still "the exception
rather than the rule," Fed. R. Evid. 702 advisory committee's
note (2000 Amendments), and "the trial court's role as gatekeeper
is not intended to serve as a replacement for the adversary
system."  United States v. 14.38 Acres of Land, 80 F.3d 1074,
1078 (5th Cir. 1996); see also Lippe v. Bairnco Corp., 288 B.R.
678, 685-87 (S.D.N.Y. 2003).  Thus, "in a close case the
testimony should be allowed for the jury's consideration.  In a
close case, a court should permit the testimony to be presented

- 38 -

at trial, where it can be tested by cross-examination and
measured against the other evidence in the case." Lippe, 288
B.R. at 700 n.6.

   2.   **Application**

      a.   **Tomaskovic-Devey**

         In his report, Tomaskovic-Devey summarizes relevant
scientific literature in the field of cognitive bias.  In the
context of the work environment, Tomaskovic-Devey reports that
research has demonstrated that cognitive errors such as
stereotyping, in-group bias, and attribution are more likely to
arise when evaluation criteria are "vague, ambiguous, and
subjective."  (T-D Report at 6).  Tomaskovic-Devey further
reports that employers can "substantially reduce cognitive bias
in personnel decisions" if they implement "[a] well designed
system for posting job vacancies, for collecting reliable,
timely, and job relevant information on candidates for promotion,
and for systematically assessing candidates' qualifications
relative to valid criteria."  (Id. at 7).  Applying the
scientific literature to the personnel practices of Parks, he
concludes that "the policies and practices at [Parks] allow
decisions to be made in an arbitrary and racially biased manner.
. . . Managerial practice at [Parks] was ideally suited to
produce and tolerate racial discrimination in employment,
promotion, and job assignment."  (Id. at 25-26) (emphasis added).

         In response, defendants have offered the expert report
of Winship, who attacks Tomaskovic-Devey's report on multiple

- 39 -

grounds, on the basis of which defendants seek exclusion of Tomaskovic-Devey's report and testimony.  Specifically, defendants argue: first, Tomaskovic-Devey failed to review all relevant evidence before forming an opinion; second, Tomaskovic-Devey summarized the evidence in an argumentative, one-sided manner; third, Tomaskovic-Devey failed to present evidence that is inconsistent with his own; fourth, Tomaskovic-Devey's reliance on stranger-to-stranger interactions was misplaced; and fifth, Tomaskovic-Devey offered his personal evaluation of the testimony.

Though several of these arguments have merit, they do not warrant exclusion of the testimony of Tomaskovic-Devey nor do they preclude the Court from considering the report at summary judgment.  Instead, these arguments go to the weight rather than the admissibility of this evidence.  Tomaskovic-Devey's conclusions are based on research examining the effect of cognitive errors on personnel decisions.  The scientific research relied upon by Tomaskovic-Devey has "been developed through laboratory, field, and survey research . . . [and] has been replicated repeatedly and . . . validated through peer review." (Id. at 3).  The proper course of action therefore is to permit Tomaskovic-Devey to testify, subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[, which] are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

- 40 -

To the extent Tomaskovic-Devey will testify that, based on his understanding of the relevant scientific literature, Parks' personnel practices "allow decisions to be made in an arbitrary and racially biased manner" and that they were "suited to produce and tolerate racial discrimination in employment, promotion, and job assignment" (T-D Report at 25-26), his testimony is both relevant and reliable.  Accordingly, defendants' request to exclude the testimony of Tomaskovic-Devey is denied.

### b.  **Schneider**

Using the personnel data from the three databases provided by Parks,[16] Schneider performed a series of regression analyses -- analyses controlling for variables that might impact the results of the data, such as job title, job tenure, and tenure with the City and employee age (as a proxy for work experience).  These regression analyses evaluate full-time, year-round employees -- whether paid out of the seasonal budget or the regular budget -- who were paid for at least six months of the

---

[16]     Schneider relied on Department of Citywide Administrative Services ("DCAS") data, Payroll Management System ("PMS") data, and Parks Seasonal Tracking System ("STS") data. PMS and DCAS are both databases maintained by the City; DCAS is the repository of personnel information for City employees, and PMS is the system used by the City to pay its employees.  STS is maintained by Parks to track seasonal personnel.  Because STS only provides usable data starting in 1996, Schneider's analysis focuses on the period between January 1996 and December 2003. (Schneider Report at 3).

year.[17]   (Schneider Report at 4-5).  Schneider's report also includes "simple statistics" -- statistics showing the breakdown of Parks personnel without controlling for variables other than race.  For example, Schneider compared the salaries of class members and non-class members without controlling for title, tenure with Parks, or any variables other than race.

Based on his analyses, Schneider concludes as follows: (1) class members are systematically underpaid relative to similarly situated non-class members; (2) class members are systematically placed in lower paying job titles, resulting in a significant salary gap; (3) class members are denied their proportionate share of wage promotions, i.e., a one-time increase in salary of a pre-determined amount; (4) class members receive systematically smaller wage increases; and (5) class members have experienced a slower growth in pay rate over time than their similarly-situated Caucasian counterparts.  (Id. at 25).  In response, defendants offer the expert report of Erath, who criticizes Schneider's report on various grounds.  Schneider rebutted Erath's report, responding to the various criticisms and modifying some of his data based on Erath's report.

Defendants seek to exclude Schneider's report, arguing that "his flawed methodology precludes consideration of his

_____

[17]    Parks Opportunity Program ("POP") workers were excluded from his database.  The POP was implemented to provide on the job training to persons on public assistance.  POP workers are paid out of the Human Resources Administration budget rather than the Parks budget.  Further, POP workers work only temporarily for Parks.  (Schneider Report at 5-7).

opinions." (Def. Mem. at 8; see also Erath Report at 1 (the data set created by Schneider contains "so many errors that the ultimate analyses are rendered meaningless"). The request for preclusion is denied. First, most of the alleged errors cited by defendants -- some of which also existed in Erath's report -- result from the nature of the raw data maintained and provided to plaintiffs by Parks. (Schneider Rebut. at 3). For example, some year-round employees are consistently coded as temporary seasonals while some who received seasonal step-ups are not tracked on the Parks Seasonal Tracking System. (Id. at 4). Second, to the extent errors existed in Schneider's initial report, Schneider's rebuttal report adopted Erath's revised database, with minor modifications, and still reaches the same conclusions. Hence, whatever the alleged deficiencies of his report, the rebuttal report is sufficiently reliable. Even Erath concedes that the database in the rebuttal report would permit experts to "perform statistical analysis and obtain meaningful results." (Erath Dep. at 83). As to the remaining criticisms, they go to the weight rather than the admissibility of the evidence.

Defendants argue, for example, that Schneider should have used "applicant flow figures" rather than the "wage promotion" methodology he adopted. (Def. Mem. at 9). But Schneider's wage promotion analysis reflects the hiring practices at Parks -- Parks' routine failure to post vacancies severely limited the applicant pool and its practices with respect to

changing titles made it difficult to create databases reflecting applications.  See, e.g., Malave v. Potter, 320 F.3d 321, 326-27 (2d Cir. 2003) (allowing alternative statistical methodologies where defendants' failure to maintain proper records created impediments to statistical analyses); cf. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 651 (1989) (noting that alternative statistical proof is permissible where preferred statistical proof would be difficult or impossible to ascertain).

Schneider's conclusions are neither speculative nor conjectural.  As with Tomaskovic-Devey's testimony and report, defendants may challenge Schneider's analyses through cross-examination and the admission of the testimony of their own experts.  Defendants' request to exclude Schneider's testimony is denied.

### c.   Lundquist's Report

Finally, defendants move to exclude Lundquist's report and testimony for three reasons: (1) Lundquist's statistics are based on a small sample; (2) the sampling was not random; and (3) her conclusions are based on improperly aggregated data.  (Def. Mem. at 54-55).  These arguments do not require exclusion.

Lundquist and defendants' experts dispute whether sufficient data was available to create a database depicting applicant pools.  (Compare Lundquist Rebut. at 2-4 (Cline improperly failed to aggregate data) with Cline Report at 20-25 (explaining her analysis of interviews)).  According to Lundquist, Parks "failed to provide complete data and

documentation on the selection procedures as required by Federal guidelines.  The Parks Department has not produced records of all vacancies, listings of candidates for all vacancies, and was unable to identify the selected candidates for all the positions filled."  (Lundquist Rebut. at 1).  Further, both sides contest the appropriate method for evaluating small samples such as the interview data, and I cannot say as a matter of law that only one or the other is permissible.  Both sides may challenge the methods employed by the opposing party's experts at trial; however, the conclusions are sufficiently reliable to be admissible.

In short, defendants' motion to exclude the testimony of plaintiffs' expert witnesses is denied, although the written reports themselves will not be received into evidence. Plaintiffs' experts may testify to their conclusions and will be subject to cross-examination and specific objections under the Federal Rules of Evidence.  The experts will not allowed to bridge the gap between their conclusions and the ultimate question of whether Parks unlawfully discriminated; they will not be permitted to testify in an argumentative manner; and they will not be permitted to opine on the credibility of fact witnesses.

## B.  **Class Claims**

Under Title VII, "pattern or practice" claims present a means by which plaintiffs may challenge systemic discrimination in the work place.  Plaintiffs have brought pattern or practice disparate treatment, disparate impact, hostile work environment,

and retaliation claims.  Defendants move for summary judgment on
these claims.

    **1.**   **Disparate Treatment**

      **a.**   **Applicable Law**

      Pattern or practice disparate treatment claims involve
"allegations of widespread acts of intentional discrimination
against individuals." Robinson v. Metro-North Commuter R.R., 267
F.3d 147, 158 (2d Cir. 2001).  To prevail on a pattern or
practice disparate treatment claim, whether brought individually
or on behalf of a class, plaintiffs must demonstrate that
intentional discrimination was the employer's "standard operating
procedure." Int'l Bhd. of Teamsters v. United States, 431 U.S.
324, 336 (1977) ("Teamsters"); see also Robinson, 267 F.3d at
158.  Proof of random or isolated acts of discrimination will not
be enough to make out such a claim.  See Teamsters, 431 U.S. at
336.  Instead, plaintiffs must present sufficient evidence to
meet their prima facie burden of showing that defendants had a
policy, pattern, or practice of intentionally discriminating
against a protected group.  Robinson, 267 F.3d at 158.  To meet
this burden, plaintiffs typically rely on two types of evidence:
"'(1) statistical evidence aimed at establishing the defendant's
past treatment of the protected group, and (2) testimony from
protected class members detailing specific instances of
discrimination.'" Id. (quoting 1 Arthur Larson et al.,
Employment Discrimination § 9.03[1], at 9-18 (2d ed. 2001)); see
also 1 Merrick T. Rossein, Employment Discrimination Law and

- 46 -

Litigation § 2:28, at 2-94 (2006) ("It is important always to present stories of actual discrimination against individuals to make the statistics come alive . . . .").

For statistics to give rise to an inference of discrimination, they must be statistically significant, for disparity among protected and unprotected groups will sometimes result by chance.  Ottaviani v. State Univ. of N.Y., 875 F.2d 365, 371 (2d Cir. 1989).  Though not dispositive, statistics demonstrating a disparity of two standard deviations outside of the norm are generally considered statistically significant. See, e.g., Smith v. Xerox Corp., 196 F.3d 358, 365-66 (2d Cir. 1999) (disparate impact claim); Ottaviani, 875 F.2d at 371 (disparate treatment claim, collecting cases).  "A finding of two standard deviations corresponds approximately to a one in twenty, or five percent, chance that a disparity is merely a random deviation from the norm . . . ."  Ottaviani, 875 F.2d at 371. Where plaintiffs demonstrate "gross statistical disparities" between the protected and unprotected groups, statistics "alone may . . . constitute prima facie proof of a pattern or practice of discrimination."  Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977) (citing Teamsters, 431 U.S. at 339).

If plaintiffs meet their prima facie burden, "[t]he burden then shifts to the employer to . . . demonstrat[e] that the [plaintiffs'] proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360; see Robinson, 267 F.3d at 159.  For example, a defendant might introduce evidence challenging "the

- 47 -

source, accuracy, or probative force" of the statistics offered by plaintiffs or counter plaintiffs' statistics with their own statistical evidence.  Robinson, 267 F.3d at 159 (quotations and citation omitted).  Consequently, the parties in pattern or practice litigation frequently engage in "the well-known phenomenon of 'statistical dueling' between . . . highly-paid experts."  McReynolds v. Sodexho Marriott Servs., Inc., 349 F. Supp. 2d 1, 6 (D.D.C. 2004).

Though "statistics are not irrefutable," Teamsters, 431 U.S. at 340, errors in statistical evidence do not necessarily render them meaningless.  See EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus., 186 F.3d 110, 116 (2d Cir. 1999) (finding that even though EEOC's statistics were not "flawless," they were sufficient to establish prima facie case of discrimination).  Whether plaintiffs' statistical analyses "carry the plaintiffs' ultimate burden will depend . . . on the factual context of each case in light of all the evidence presented by both the plaintiff[s] and the defendant[s]."  Bazemore v. Friday, 478 U.S. 385, 400 (1986) (per curiam).  Moreover, "statistics come in infinite variety and . . . their usefulness depends on all of the surrounding . . . circumstances."  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 n.3 (1988) (citation and quotation omitted).

### b.   **Application**

I apply the law first to plaintiffs' promotion and compensation claims and second to plaintiffs' segregation and underfunding claims.

### i.   **Promotion and Compensation**

From the evidence before the Court, a reasonable jury could find that defendants engaged in a pattern or practice of discriminating against African-American and Hispanic employees in promotions and compensation.  That evidence includes the following:

First, plaintiffs' statistical evidence shows, as summarized above, that class members were systemically placed in lower-paying jobs, were systemically underpaid relative to similarly situated Caucasians, and experienced slower growth in pay compared to similarly situated Caucasians.  For example, between 1996 and 2003, class members held roughly 85% of the positions paying less than $20,000 while holding less than 16% of the positions paying more than $50,000 and barely holding 10% of the positions paying more than $70,000.[18]  Controlling for job title, class members were paid between $16.44 and $32.59 less

_____

[18]   Though these figures do not take into account factors other than race, "simple statistics" may be considered in evaluating discrimination claims.  See Stratton v. Dep't for the Aging for the City of New York, 132 F.3d 869, 877 (2d Cir. 1997). Moreover, plaintiffs' regression analyses -- analyses taking into account factors other than race -- show statistically significant disparities in the wages and promotions received by class members and non-class members.  Thus, plaintiffs' statistical evidence taken as a whole demonstrate a pattern or practice of discrimination at Parks.

than Caucasian members on a bi-weekly basis between 1997 and 2003
-- statistically significant disparities.  (Schneider Rebut.
Table 2).  Salaries of Caucasians increased, on average, at a 4%
higher rate than class members' salaries -- again, a
statistically significant level.

　　　　　With respect to promotions, compared to Caucasians,
there was a statistically significant lower probability that
class members would receive a wage promotion.  Although more than
50% of Parks' non-managerial workforce consisted of class
members, for the five-year period from 1996 through 2001, class
members made up only 18 to 23% of the managerial workforce.  Even
the EEOC, the EEPC, and DOJ concluded that the statistics showed
significant underrepresentation of class members in managerial
and higher-paid positions.

　　　　　Second, plaintiffs offer anecdotal evidence of specific
instances of discrimination and retaliation in promotions and
compensation.  For example, Rogers earned approximately $27,000
per year when she was the Center Manager of the East 54th Street
Recreation Center, while Lynda Ricciardone's salary was $35,000
per year one month after securing the Center Manager Position at
the Asser Levy facility.  (Pl. Dep. Ex. 140).  Moreover, Wright's
salary was decreased when he received a promotion to Parks
Recreation Manager; he therefore earned between $6,000 and $8,000
less than Caucasian Parks Recreation Managers.  Even though she
had been working as WEP Citywide Coordinator for several years,
Loving was denied the chance to even apply for a newly created

"Director of WEP" position.  A Caucasian employee with less experience than she was awarded the position instead.

Third, plaintiffs have offered evidence of numerous statements by Stern and other Parks officials that demonstrate discriminatory and racially hostile attitudes on the part of decision-makers.  A reasonable jury could conclude that these comments reflected a discriminatory animus.

Finally, plaintiffs have offered evidence of personnel practices at Parks that would permit discrimination to flourish. Managerial positions were routinely filled without announcement or posting.  Stern had unilateral authority to determine salaries, which would then drive the assignment of civil service titles.  Moreover, Stern and other senior officials would sometimes personally select employees for promotions, including for low-level positions.  Parks did not have policies in place for determining which vacant positions should be posted, who would be given interviews, or how interviewees should be rated; Parks only haphazardly followed the policies and procedures that were in place.

Defendants offer several arguments in response, but defendants fail to demonstrate that no genuine issue of material fact exists for trial.  For example, defendants contend that "[t]he mere absence of minority employees in upper-level positions does not suffice to prove a prima facie case of discrimination without a comparison to the relevant labor pool." (Def. Mem. at 8 (quoting Carter v. Ball, 33 F.3d 450, 456-57 (4th

Cir. 1994))).  In this case, however, plaintiffs do not rely
solely on the absence of class members in upper-level positions.
Rather, they rely on other statistics, personnel practices, and
anecdotal evidence as well.  Though several of these statistics
do not take into account factors other than race, they
nevertheless provide support for plaintiffs' regression analyses
and weaken defendants' challenges to those analyses.  Moreover,
again, many of defendants objections -- including their
objections to Schneider's wage promotion analysis -- go to weight
rather than admissibility, and it will be up to the jury to
decide whether to accept these criticisms.

Defendants also argue that there is nothing inherently
sinister about subjective or ad hoc employment practices.  Such
"subjective and ad hoc" employment practices, however, bolster
plaintiffs' claim that defendants discriminated against class
members.  Multiple courts have observed that "'[g]reater
possibilities for abuse . . . are inherent in subjective
definitions of employment selection and promotion criteria,'"
such as those in place at Parks.  Davis v. Califano, 613 F.2d
957, 965 (D.C. Cir. 1979) (quoting Rogers v. Int'l Paper Co., 510
F.2d 1340, 1345 (8th Cir. 1975)) (omission in original); accord
Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1016 (2d Cir.
1980) (recognizing that subjective hiring practices might mask
racial bias).  Indeed, plaintiffs argue that the dangers inherent
in subjective employment practices are even greater at Parks
because Stern was at the helm, citing Stern's alleged "racist

- 52 -

statements, racially discriminatory acts by him and others, and his indifference to EEO matters, including his racially discriminatory justifications for Parks' failure to promote class members." (Pl. Mem. at 6). Defendants respond that plaintiffs have "embarked on a diatribe against Henry Stern" (Def. Reply at 1) and describe some of his statements as neutral or ambiguous (Def. Mem. at 34). Though Stern's various statements and actions are susceptible to multiple interpretations, a reasonable jury could conclude that he held racial prejudices and that these prejudices influenced his treatment of Parks employees. Though certainly not determinative, evidence of Parks' personnel practices further support plaintiffs' prima facie case.

Defendants have offered meritorious criticisms of many of the statistical analyses offered by plaintiffs. Nevertheless, though plaintiffs' analyses are imperfect, the variety of analyses and the consistency of the results decrease the risk and degree of harm of potential errors. Because material issues of fact exist as to whether Parks' intentionally discriminated in granting promotions and setting wages, defendants' motion for summary judgment with respect to plaintiffs' disparate treatment compensation and promotion claims is denied.

### ii. **Segregation and Underfunding**

Defendants also move for summary judgment on plaintiffs' disparate treatment claims based on purported segregation in assignments and underfunding of Parks in predominantly African-American or Hispanic neighborhoods.

Plaintiffs have raised fair concerns, particularly in light of admissions of Parks management officials that, on occasion, employees were placed in work locations based on race. Work assignments based on race generally run afoul of the Constitution.  See Patrolmen's Benevolent Ass'n of N.Y. v. City of N.Y., 310 F.3d 43, 52 (2d Cir. 2002) (upholding jury finding that police department violated Equal Protection Clause in assigning policemen to precinct based on race).  Even where clients, in this case New York City residents, request that an assignment be based on race, a government employer does not have "carte blanche to dole out work assignments based on race." Patrolmen's Benevolent Ass'n, 310 F.3d at 52-53.  Rather, the employer must demonstrate that the racially-based assignment was "'motivated by a truly powerful and worthy concern and that the racial measure . . . adopted is a plainly apt response to that concern.'"  Id. (quoting Wittmer v. Peters, 87 F.3d 916, 918 (7th Cir. 1996)).  Where an agency assigns employees based on race, even if only occasionally, it gives effect to racial prejudices. Palmore v. Sidoti, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

Despite these concerns, the motion to dismiss the segregation claim is granted because plaintiffs have failed to present sufficient evidence that it was Parks' standard operating procedure to make assignments based on race.  Plaintiffs have relied primarily on anecdotal evidence -- testimony of class

- 54 -

members who note that in their experience assignments are based on race, and that park crews correspond to the ethnicity of the neighborhoods in which the parks were located.  But plaintiffs have not presented sufficient statistical evidence to support their claim, as the only statistics offered in this respect are the flawed statistics of Schneider based on the mistaken belief that employees worked in the zip codes used in his analysis when they did not.  Nor have plaintiffs offered any evidence to show that, even assuming there are statistical disparities, the disparities resulted from a practice or policy of assigning employees based on race.

Likewise, plaintiffs' underfunding claim primarily relies on the testimony of class members that parks in African-American and Hispanic neighborhoods were in worse condition and received repairs and new equipment less frequently than parks in Caucasian neighborhoods.  This conclusory testimony, however, is not supported by concrete particulars, or by any statistical analysis.  Plaintiffs have not presented sufficient evidence to demonstrate that Parks had a policy, pattern, or practice of underfunding parks in predominantly African-American or Hispanic neighborhoods.  Accordingly, defendants' motion is granted in this respect.

### 2.  **Disparate Impact**

Plaintiffs also allege that Parks' policy regarding the posting of positions and the application and interview process

disparately impacted class members.  Defendants move for summary judgment as to this claim.

### a.  **Applicable Law**

Title VII prohibits not only overt and intentional discrimination, but also facially neutral practices that have a disparate impact on protected groups.  Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003); Smith v. Xerox Corp., 196 F.3d 358, 364 (2d Cir. 1999) ("[D]isparate impact theory targets practices that are fair in form, but discriminatory in operation.") (citation and internal quotation marks omitted).  Thus, disparate impact claims offer a means to erase "employment obstacles, not required by business necessity, which create built-in headwinds and freeze out protected groups from job opportunities and advancement." Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 160 (2d Cir. 2001) (quoting EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000)).

To meet their prima facie burden in a disparate impact case, plaintiffs must demonstrate that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(k)(1)(A)(I).  Specifically, plaintiffs "must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." Robinson, 267 F.3d at 160; see also Gulino v. New York State Educ. Dep't, No. 03 Civ. 9062, 2006 WL 2380829, at *17 (2d Cir. Aug. 17, 2006).  In identifying a specific employment practice,

plaintiffs must do more "than rely on bottom line numbers in an employer's workforce." Smith, 196 F.3d at 365.  Rather, plaintiffs must demonstrate a statistical disparity "'sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" Id. (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)).  As in pattern or practice disparate treatment cases, statistics must be statistically significant to give rise to an inference of causation.  Id. Statistical results cannot be "persuasive," however, "absent a close fit between the population used to measure disparate impact and the population of those qualified for a benefit." Carpenter v. Boeing Co., 456 F.3d 1183, 1197 (10th Cir. 2006)

In disparate impact cases, parties frequently disagree on the proper populations or markets to be compared in statistical analyses.  For cases involving allegations of discriminatory hiring, the relevant comparison is "between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market." Malave, 320 F.3d at 326 (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51 (1989)) (alterations in original).  In contrast, for cases alleging discrimination in promotions, the relevant comparison "is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted." Id.  Despite these principles, the Supreme Court has clarified that alternative

comparisons may be appropriate where such statistics "will be difficult if not impossible to ascertain."  <u>Wards Cove</u>, 490 U.S. at 651.

       **b.**   **<u>Application</u>**

            **i.**   **<u>Plaintiffs' Prima Facie Case</u>**

       Plaintiffs have identified policies and practices that they contend are discriminatory; they allege that class members have been adversely impacted by Parks' failure to regularly post and interview for vacancies and Parks' interview procedures. Plaintiffs further allege that class members have been adversely impacted by the "Class Of" Program.

       Plaintiffs have also presented evidence of statistically significant disparities between class members and non-class members with respect to promotions, compensation, and the "Class Of" Program, as discussed above.  The numbers are stark, as there are far lower percentages of class members in the higher-paid positions than there are in the lower-paid positions. Class members received statistically significant lower interview scores than Caucasians.  Notably, the level of disparity dramatically increased after the time period in which this lawsuit was filed.  (Lundquist Report at 13).

       Plaintiffs have also presented evidence of a causal connection between the policies and practices in question and the statistical disparities.  First, plaintiffs' statistics are statistically significant and therefore give rise to an inference of causation.  <u>See</u> <u>Smith</u>, 196 F.3d at 365.

Second, Parks failed to examine the validity of its interview process or its minimum requirements for jobs. (Lundquist Report at 16-32).  The Uniform Federal Guidelines provide that "an inference of adverse impact of the selection process" may be drawn where an employer fails to maintain data on adverse impact where an employer "has an underutilization of a group in the job category, as compared to the group's representation in . . . the applicable work force." (Id. at 6 (quoting Uniform Guidelines, Section 4D, p. 38298)).  Here, Parks repeatedly indicated an awareness of underutilization of class members in certain job categories in its annual reports to the EEPC, and yet failed to maintain data.

Third, as numerous Parks officials acknowledged, Parks did not regularly post available positions.  With the exception of Beach, all of the named plaintiffs identified positions for which they would have applied had they been posted.  Further, Parks officials conceded that it did not have any policies regarding when interviews should be conducted or how interviewees' scores should be evaluated.

As Tomaskovic-Devey concluded, Parks' subjective personnel practices could "allow decisions to be made in an arbitrary and racially biased manner" and were "ideally suited to produce and tolerate racial discrimination in employment, promotion, and job assignment." (T-D Report at 25-26).  A reasonable jury could accept these conclusions and find that plaintiffs have met their prima facie burden of demonstrating

that Parks' subjective employment practices adversely impacted
class members.

## ii.  Defendants' Contentions

Defendants move for summary judgment on this claim
because: (1) it was not included in the named plaintiffs' EEOC
charges; (2) it is not truly a disparate impact claim; and (3)
plaintiffs have failed to make the requisite statistical showing
of disparate impact.  (Def. Mem. at 49-50).

Defendants' first argument fails.  Though federal
courts generally do not have jurisdiction over claims not alleged
in an EEOC charge, it is well settled that there is jurisdiction
where a claim is "reasonably related" to the EEOC charges.  See
Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998).
Here, the disparate impact claim is clearly reasonably related to
the EEOC charges, for Parks' promotion policies "'would fall
within the scope of the EEOC investigation . . . of the charge
that was made.'"  Williams v. N.Y.C. Housing Auth., 458 F.3d 67,
70 (2d Cir. 2006) (per curiam) (quoting Fitzgerald v. Henderson,
251 F.3d 345, 359-60 (2d Cir. 2001) (internal quotation marks
omitted)).

Defendants' next argument -- that the disparate impact
claim alleges that defendants acted with discriminatory intent
and, therefore, they have not identified a facially neutral
policy or practice (Def. Mem. at 52) -- also fails.  First,
disparate impact and disparate treatment theories are "simply
alternative doctrinal premises for a statutory violation,"

Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d
106, 115 (2d Cir. 1992), and "[e]ither theory may . . . be
applied to a particular set of facts," Teamsters, 431 U.S. 324,
335 n.15 (1988).  There is nothing inconsistent in acting with
intent to discriminate while adopting a facially neutral policy
that has a disparate impact; the two are not mutually exclusive.

        Second, defendants' argument misconstrues the facially
neutral practice alleged by plaintiffs.  Plaintiffs' disparate
impact claim focuses on Parks' subjective promotion practices,
the type of practice that the Supreme Court has held can give
rise to a disparate impact claim.  Watson, 487 U.S. at 990-91.
These practices -- failing to post, failing to interview, the
interview procedures used by Parks, and the "Class Of" Program --
are not discriminatory on their face, for they apply regardless
of an employee's race.  As these subjective practices were
employed, however, plaintiffs allege -- and a reasonable jury
could conclude based on the statistical and other evidence --
that class members were disparately impacted.

        Finally, defendants challenge plaintiffs' disparate
impact statistics.  For the reasons stated in the discussions of
the experts' reports and the disparate treatment claims above,
defendants' objections are overruled.  This prong of defendants'
motion is denied.

3.   **Hostile Work Environment**

   a.   **Applicable Law**

   "[W]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (internal quotation marks omitted); see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006).[19]  In the context of individual hostile work environment claims, it is well settled that for a plaintiff to recover, her working environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris, 510 U.S. at 21-22.  Where plaintiffs allege a pattern or practice of a hostile work environment, however, the legal standards become murkier.  Though neither the Supreme Court nor the Second Circuit has clarified the requirements plaintiffs must meet to satisfy their prima facie burden in a pattern or practice

---

   [19]   The same standards govern hostile work environment claims whether such claims are based on race or sex.  Morgan, 536 U.S. at 116 n.10.

hostile work environment action,[20] several district court opinions provide guidance.

In EEOC v. Mitsubishi Motor Manufacturing of America, Inc., 990 F. Supp. 1059 (C.D. Ill. 1998), plaintiffs alleged that defendants engaged in a pattern or practice of sexual harassment. Defendant moved for summary judgment, arguing that, because hostile work environment claims require proof that conduct was subjectively offensive, they are inconsistent with the pattern or practice framework.  The district court rejected defendants' argument, concluding that it did "not need to make a great leap of faith to state the obvious: Title VII authorizes a pattern or practice action for sexual harassment."  Id. at 1070.

Next, the court turned to how such a claim should be proven.  Adopting the two-stage liability process used in pattern or practice disparate treatment and disparate impact claims, the court found that at the liability stage, plaintiffs must demonstrate, "by a preponderance of the evidence, that an objectively reasonable person would find the existence of: (1) a hostile environment of sexual [or racial] harassment within the company (a hostile environment pattern or practice) . . . ; and

---

[20]     Indeed, as defendants observe, the Supreme Court and Courts of Appeal have not held that hostile work environment claims are consistent with the pattern or practice framework. (Def. Reply at 12 n.8).  In the absence of contrary authority, I agree, as held in EEOC v. Mitsubishi Motor Manufacturing of America, Inc., 990 F. Supp. 1059 (C.D. Ill. 1998), and EEOC v. Dial Corp., 156 F. Supp. 2d 926 (N.D. Ill. 2001), that, where an employer has a policy or practice of tolerating a hostile work environment, a pattern or practice claim is an appropriate mechanism by which employees may challenge that discriminatory conduct.

(2) a company policy of tolerating (and therefore condoning and/or fostering) a workforce permeated with severe and pervasive sexual [or racial] harassment." Mitsubishi, 990 F. Supp. at 1073.  Multiple district courts have since adopted this two-pronged standard in evaluating claims for sexual or racial hostile work environment pattern or practice claims.  See, e.g., Employees Committed for Justice v. Eastman Kodak Co., 407 F. Supp. 2d 423, 430 (W.D.N.Y. 2005) ("Rather, the issue under the pattern or practice framework is whether there was a systemic culture of harassment and whether it was 'standard operating procedure' to permit such conduct without consequences or discipline to those responsible."); EEOC v. Dial Corp., 156 F. Supp. 2d 926 (N.D. Ill. 2001) (denying summary judgment for defendants on pattern or practice hostile work environment claim, concluding that triable issue of fact existed as to whether a reasonable person would find the working environment at issue severely or pervasively hostile).

As to whether a hostile work environment existed under the first prong, summary judgment will only be appropriate "if it can 'be concluded as a matter of law that no rational juror could view [the alleged conduct] as . . . an intolerable alteration of . . . working conditions.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 75 (2d Cir. 2001).  Sporadic or episodic instances of harassment will generally not be sufficient to survive summary judgment on a claim of hostile work environment harassment; "[r]ather, the [employee] must demonstrate either that a single

incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [the] . . . working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). Factors to be considered in evaluating whether a work environment is sufficiently hostile include "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Holtz, 258 F.3d at 75 (quoting Faragher, 524 U.S. at 787-88). Though these standards have been articulated in the context of individual hostile work environment claims, they are equally useful in determining whether a work environment was sufficiently hostile for a pattern or practice claim.

The totality of the circumstances must be considered, for a hostile work environment "occurs over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." Morgan, 536 U.S. at 115; see also Mitsubishi, 990 F. Supp. at 1073 (trier of fact must consider totality of circumstances); Jenson v. Eveleth Taconite Co., 824 F. Supp. 847, 885 (D. Minn. 1993) (fact-finder should consider that "each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment . . . created may exceed the sum of the

individual episodes").  In the context of pattern or practice cases, the focus is on the "the landscape of the total work environment, rather than the subjective experiences of each individual claimant." Mitsubishi, 990 F. Supp. at 1074.[21]

Even where a hostile work environment exists, plaintiffs must demonstrate a specific basis for imputing liability to the employer.  In individual actions, an employer is not liable if it demonstrates that (1) it took reasonable steps to prevent and to promptly remedy harassing conduct, and (2) the harassed employee unreasonably failed to avail herself of any corrective or preventive opportunities made available by the employer.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 760-61 (1998); Faragher, 524 U.S. at 807.  In a pattern or practice case, plaintiffs must demonstrate that the company had notice of the hostile work environment and was negligent in its response to the environment.  Mitsubishi, 990 F. Supp. at 1074. "When harassing behavior occurs frequently enough and is both common and continuous, a company can reasonably be said to be on 'notice' of a severe and pervasive problem of . . . harassment that constitutes a hostile environment." Id. (citing Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1531 (M.D. Fla. 1991) ("an employer incurs liability when harassing behavior happens frequently enough that the employer can take steps to

---

[21]     Although a single "extraordinarily severe" incident may be sufficient to create a hostile environment in an individual case, Cruz, 202 F.3d at 570, it is hard to conceive of any single incident that could support a pattern and practice claim.

halt it")).  To demonstrate negligence, plaintiffs must show that the employer knew or should have known that the work environment was hostile and nevertheless failed to take steps to correct the problem on an agency-wide basis.  Id. at 1075.

### b.  Application

Although plaintiffs have offered evidence of sporadic or episodic incidents of discriminatory conduct, they have not presented evidence from which a reasonable jury could find a systemic culture of harassment or that racial harassment was standard operating procedure at Parks.  On the record before the Court, no reasonable jury could find that Parks was permeated with discriminatory conduct of a severe or pervasive nature, sufficient to alter the conditions of employment on a classwide basis.

Parks was spread out over the five boroughs, with employees working in more than 4,000 locations.  Though plaintiffs have offered evidence of offensive statements made by Stern and others, this evidence is insufficient to show that racial harassment was standard operating procedure at Parks.  The statements were spread out over a period of time and many were made in private.  In fact, several of the named plaintiffs denied being subjected to a hostile work environment.[22]

---

[22]    Plaintiffs have also offered admissible evidence of three noose incidents in the late 1990s.  These incidents, however, were few in number and remote in time and location. Only a small number of employees observed the nooses.  Moreover, one of the noose incidents involved a supervisor displaying a noose in her workplace as part of her annual Halloween
                                                    (continued...)

- 67 -

It would be mere speculation for a jury to conclude that a significant number of class members were subjected to severe or pervasive conduct or that the conditions of employment for a significant number of class members were altered, both subjectively and objectively.

### 4.   **Pattern or Practice Retaliation**

### a.   **Applicable Law**

Title VII prohibits an employer from subjecting an employee to adverse consequences "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Thus, Title VII has two different clauses that each protect a different type of activity; the "opposition clause" protects an employee's opposition to an unlawful employment practice, while the "participation clause" protects participation in a proceeding under Title VII.  See Deravin v. Kerik, 335 F.3d 195, 203 n.6 (2d Cir. 2003).  Further, "Title VII is violated when 'a retaliatory motive plays a part in adverse . . . actions toward an employee, whether or not it was the sole cause.'"  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal citations omitted).

On a motion for summary judgment, a plaintiff must first demonstrate that "[he] was engaged in protected activity

---

[22](...continued)
decorations.

. . . [and that] the employer was aware of that activity."
Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998);
see also Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.
1996).  The term "protected activity" refers to action taken to
protest or oppose statutorily prohibited discrimination.  See 42
U.S.C. § 2000e-3; see also Wimmer v. Suffolk County Police Dep't,
176 F.3d 125, 134-35 (2d Cir. 1991).  Informal as well as formal
complaints constitute protected activity.  Sumner v. United
States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Moreover,
to establish that his activity is protected, a plaintiff "need
not prove the merit of his underlying discrimination complaint,
but only that he was acting under a good faith, reasonable belief
that a violation existed."  Id.; see also Grant v. Hazelett
Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989).

        Next, as the Supreme Court recently clarified, a
plaintiff must demonstrate that he was subject to an action "that
a reasonable employee would have found . . . materially adverse,
'which in this context means it well might have dissuaded a
reasonable worker from making or supporting a charge of
discrimination.'"  Burlington N. & Santa Fe Ry. v. White, 126 S.
Ct. 2405, 2006 WL 1698953, at *10 (June 22, 2006) (quoting Rochon
v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (quotation
omitted).  Thus, the category of challenged actions that might be
considered retaliatory is broader than "adverse employment
actions" or "ultimate employment decisions," for the scope of
Title VII's "anti-retaliation provision extends beyond [the]

workplace-related or employment-related retaliatory acts and harm" prohibited by Title VII's anti-discrimination provision. Id.

An adverse action is not defined "solely in terms of job termination or reduced wages and benefits[.] . . . [L]ess flagrant reprisals by employers may indeed be adverse." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). At the same time, however, "'not every unpleasant matter short of [discharge or demotion] creates a cause of action' for retaliat[ion]." Id. (quoting Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994)); see also Burlington N. & Santa Fe Ry., 126 S. Ct. 2405, 2006 WL 1698953, at *10 (noting that petty slights and minor annoyances will not suffice). Whether a particular action is considered retaliatory will "often depend on the particular circumstances," for "[c]ontext matters." Burlington N. & Santa Fe Ry., 126 S. Ct. 2405, 2006 WL 1698953, at *11. Courts must examine closely "each case to determine whether the challenged employment action reaches the level of 'adverse,'" Wanamaker, 108 F.3d at 466, for an action that makes little difference to one employee may be materially adverse to another employee, Burlington N. & Santa Fe Ry., 126 S. Ct. 2405, 2006 WL 1698953, at *11.

Finally, a plaintiff must show that "there was a causal connection between the protected activity" and the allegedly retaliatory action. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998). A plaintiff may prove causation either "(1)

indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).  Although the burden that a plaintiff must meet to establish a prima facie case at the summary judgment stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a retaliatory motive.  See Cronin v. Aetna Life Ins., 46 F.3d 196, 203-04 (2d Cir. 1995).

Here, plaintiffs allege that Parks engaged in a pattern or practice of retaliating against employees who engaged in protected activity.  Accordingly, plaintiffs must demonstrate that retaliation in response to protected activity was Parks' standard operating procedure.  Teamsters, 431 U.S. 324, 336 (1977).

### b.  **Application**

Plaintiffs have presented evidence from which a reasonable jury could find that Parks engaged in a pattern or practice of retaliating against employees who engaged in protected activity.

First, class members engaged in protected activity of which defendants were aware both informally by complaining to supervisors and more formally by filing charges or complaints of

discrimination with the Parks' EEO office or the EEOC as well as by filing this lawsuit.

Second, a reasonable jury could find that class members were subjected to adverse, material consequences, including, for example, the following:

- Walter Beach, the Chief of Recreation in Brooklyn until May 1999, was asked by the Brooklyn Commissioner to resign after Beach wrote memoranda in August 1998 and March 1999 expressing concern over Parks' treatment of class members and several named plaintiffs filed charges with the EEOC. (Beach 4/3/03 Dep. at 84-89).

- Jacqueline Brown received a negative performance evaluation after she complained to the EEO officer of discriminatory treatment; the evaluation referred to her complaints. (Brown 1/30/03 Dep. at 140-41).

- Angelo Colon received warnings and a downgraded performance evaluation after he filed discrimination charges with the EEOC. (Ex. G00462-63, G00403; Colon 4/17/03 Dep. at 268-70). In 2001 and 2002, Colon's supervisor repeatedly conditioned salary increases on the termination of this lawsuit. (Colon 9/9/02 Dep. at 7-8; Colon 4/17/03 Dep. at 28-35).

- After she complained about being denied a position, Odessa Portlette was assigned to work in the basement for six months. (Portlette 2/12/03 Dep. at 117-19).

- Kathleen Walker was also moved to a basement
office after she filed charges with the EEOC.  (Walker Dep.
9/17/02 Dep. at 100-02).

Third, a reasonable jury could also find a causal
connection between the adverse actions and the protected
activity.  Plaintiffs have offered, for example, direct evidence
of causation, as some supervisors explicitly offered raises,
promotions, or desired transfers in return for the dropping of
claims of discrimination.  Plaintiffs have offered evidence
directly showing retaliatory animus: Jacqueline Brown was told by
Webster that complaining was frowned upon by Parks and Benepe
asked Wright not to file this lawsuit.  Plaintiffs have also
offered circumstantial evidence of causation, including, for
example, the timing of adverse actions shortly after a class
member engaged in protected activity.

Finally, the record also contains evidence that
retaliation occurred on an agency-wide basis.  Between 1995 and
2003, for example, some thirty Parks employees filed retaliation
complaints with outside agencies.  Seven of the named plaintiffs
have offered specific evidence of retaliation against them.
Moreover, the record contains evidence of lack of receptiveness
to discrimination complaints, not just from individual Parks
supervisors, but an attitude flowing from the top down.  The EEPC
also found a number of flaws in Parks' EEO complaint processing
procedures.

This prong of the motion is denied.

C.   **Individual Claims**

   1.   **Teamsters Presumption versus McDonnell Douglas Burden Shifting**

       Where a trier of fact concludes that an employer engaged in a pattern or practice of discrimination, individual class members are entitled to a presumption "that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." Teamsters, 431 U.S. at 362.  A class member therefore need only show that she was subjected to an adverse employment decision.  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 159 (2d Cir. 2001).  The employer may then rebut this presumption by offering admissible evidence from which a jury could conclude that the employment decision was made for lawful reasons.  Id. at 159-60; see also Ghosh v. N.Y. City Dep't of Health, 413 F. Supp. 2d 322, 335-36 (S.D.N.Y. 2006) (holding that defendants did not meet burden of articulating non-discriminatory reason for employment decision where they did not submit admissible evidence to support their articulation) (citing Mandell v. County of Suffolk, 316 F.3d 368, 380 (2d Cir. 2003)).

       The Teamsters presumption generally arises in the context of determining the parties' burdens at trial rather than on summary judgment.  Nevertheless, defendants have conceded that, for the purposes of summary judgment only, the individual plaintiffs' claims are entitled to the Teamsters presumption should the class claims survive summary judgment.  (Def. Opp. to

Mot. to Bifurcate at 7).  Hence, because I have found that material issues of fact exist with respect to the pattern or practice disparate treatment, disparate impact, and retaliation claims, plaintiffs receive the benefit of the <u>Teamsters</u> presumption as to their individual compensation, promotion, and retaliation claims.

### 2.  **Compensation**

Defendants move for summary judgment dismissing the compensation claims of Jacqueline Brown, Angelo Colon, Paula Loving, Odessa Portlette, Elizabeth Rogers, Henry Roman, Kathleen Walker, and Robert Wright.

To survive a motion for summary judgment on the compensation claims under the <u>Teamsters</u> presumption, each plaintiff must first present evidence from which a reasonable jury could find that she was subjected to an adverse employment decision, <u>i.e.</u>, that defendants failed to compensate her equally. Specifically, a plaintiff must demonstrate that she was paid less than a member of a non-protected group for work requiring substantially the same responsibility.  See <u>Belfi v. Prendergast</u>, 191 F.3d 129, 139 (2d Cir. 1999); <u>Wright v. Milton Paper Co.</u>, No. 99 Civ. 5724 (SJ), 2002 WL 482536, at *8 (E.D.N.Y. Mar. 26, 2002).  A plaintiff need not demonstrate that two positions are identical; rather, it is sufficient to show that the positions are substantially equivalent.  See <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (2d Cir. 1995).

If the plaintiff meets this minimal burden, defendants must then offer admissible "evidence that a legitimate non-discriminatory reason existed" for the employment decision. Robinson, 267 F.3d at 162.  The employer's asserted non-discriminatory reason is "subject to further evidence by the [plaintiff] that the purported reason for . . . [the adverse employment decision] was in fact a pretext for unlawful discrimination."  Teamsters, 431 U.S. at 362 n.50 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-06 (1973)).

For most of plaintiffs' compensation claims, the analysis turns on whether plaintiffs have identified an appropriate comparator.  Whether positions are "substantially equivalent" is usually a question of fact for the jury.  Lavin-McEleney v. Marist Coll., 239 F.3d 476, 480 (2d Cir. 2001) (equal pay claim); see also Tomka, 66 F.3d at 1312 ("A claim of unequal pay for equal work under Title VII . . . is generally analyzed under the same standards used in an EPA claim.").

Defendants' motion for summary judgment dismissing the individual compensation claims is denied, for each of the individual plaintiffs in question has presented sufficient evidence to raise a genuine issue of material fact for trial. Jacqueline Brown, for example, received only one discretionary pay increase -- a $3,000 raise in 1988 -- in more than twenty years at Parks, while arguably comparably situated Caucasian employees received more discretionary pay increases.  (Brown 8/28/02 Dep. at 66; Def. Exs. 41, 79; Pl. Mem. at 118).  Angelo

Colon, a Center Manager, points to at least four Caucasian Center
Managers who received higher salaries than he did from May 1977
through October 2000.  (<u>See</u> Pl. Mem. at 114; Compl. ¶ 122).  A
reasonable jury could conclude that Odessa Portlette was
similarly situated to Brian Clark and Sarah Horowitz, Caucasian
employees who were paid more than Portlette.  (Pl. Mem. at 103;
Portlette 8/26/02 Dep. at 18-19; Portlette 2/12/03 Dep. at 17-18;
I00346-47).  Elizabeth Rogers earned $27,148 as Recreation
Director of Thomas Jefferson Recreation Center, while non-class
member Thomas Medich earned $32,985 as the Recreation Director of
the Carmine Street Center.  (Def. Ex. 41).  Though Rogers has
earned $27,962 since 1999, her Caucasian replacement as
Recreation Director of the 54th Street Center, Christopher
Miller, earned $31,314 shortly after taking over the position.
(<u>Id.</u>; Pl. Mem. at 99).

Some of the purported comparators relied on by
plaintiffs are not similarly situated, as a matter of law, but I
do not take the time now to discuss each purported comparator.
Plaintiffs will not be permitted at trial to put into issue an
unreasonable number of comparators.  The Court will set a limit,
and defendants may also move in limine to narrow the number of
comparators plaintiffs may put into issue at trial.

   3.   **Promotion Claims**

With the exception of Robert Wright and Elizabeth
Rogers, defendants move for summary judgment on plaintiffs'
promotion claims.

To survive summary judgment on their failure to promote claims under the Teamsters presumption, each plaintiff must first demonstrate evidence from which a reasonable jury could find that he or she was subjected to an adverse employment decision, i.e., that defendants failed to promote him or her, during the relevant time period.  Where a position was posted, the plaintiff must therefore demonstrate that he applied for that position but was rejected.  Where a position was not posted, the plaintiff must demonstrate either that he would have applied for the position had he known of its availability or that he did apply through the employer's informal processes and was rejected.  See Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004); Mauro v. S. New Eng. Telecomms., Inc., 208 F.3d 384, 387 (2d Cir. 2000) (per curiam). Defendants may then offer evidence demonstrating a legitimate, non-discriminatory reason for the employment decision, which the plaintiffs may argue is pre-textual.

Defendants' motion is also denied to the extent it seeks dismissal of the individual promotion claims.  With the backdrop of the statistical, anecdotal, and other evidence that supports the pattern and practice claims, the individual plaintiffs have presented sufficient additional evidence to meet the minimal Teamsters burden.  All of the individual plaintiffs have identified positions for which they were qualified, and for which they were rejected or of which they were not aware because of Parks' failure to post them.  Issues of fact exist as to

whether the explanations offered by defendants were pretextual. Some examples are illustrative:

- Carrie Anderson testified that she submitted an application for the position of Parks Recreation Manager to Chief of Operations Dorothy Lewandowski and identified the job posting to which she responded. (Anderson 9/5/02 Dep. at 63-64; Anderson 1/09/03 Dep. at 168-69; Ex. PL-00029). She did not receive this promotion. Likewise, Anderson produced evidence that she applied for a PPS position but was also denied. (Anderson 9/5/02 Dep. at 96-97; D00705-706). Thus, Anderson has demonstrated that she was subject to adverse employment decisions with respect to these positions. Defendants have not offered any non-discriminatory explanation for the failures to promote. Indeed, defendants do not contest that Anderson was qualified, instead arguing that Anderson did not apply for these positions or that these positions did not exist. (Def. Mem. at 79). But these are factual arguments to be made to the jury.

- Jacqueline Brown asserts that she was denied promotions to the posted positions of Queens Deputy Chief of Recreation in 1999 and Deputy Chief of Operations in 2001 and to the unposted or improperly posted positions of Director of Central Recreation, Director of Urban Parks Rangers, Assistant to the Commissioner, Parks Administrator, Chief of Operations, PRM, and Chief of Recreation. Defendants have not addressed Brown's claims as to the unposted or not properly posted positions.

- Paula Loving's supervisor testified that Loving was smart, ambitious, reliable, a good communicator, and a very good worker.  Indeed, he nominated her for and she was awarded the January 1997 employee of the month award, because she had coordinated the WEP Program, which had grown from 250 participants to more than 4,000 participants, supervised the WEP coordinators in all five boroughs, acted as a liaison with HRA, and produced reports documenting the program's growth.  (Pl. Dep. Ex. 95A).  Loving had worked as Citywide WEP Coordinator for four years when Parks created a Director of WEP Operations position in 1997.  Leimas, who had been working on a WEP-related matters for less than one year, was awarded the position.  Because the position was not posted, Loving could not even apply for the new position.  When Leimas left Parks one year later, Parks appointed Felderstein -- a 1997 college graduate who had worked at Parks for less than one year -- without posting the position.  As to both positions, a reasonable jury could certainly conclude that defendants' explanations for these decisions are pretextual, for Loving had significantly more experience performing substantially the same responsibility.

- Robert Wright received a decrease in salary from $55,433 to $49,920 when he received a promotion to Park Recreation Manager.  (Def. Resp. Pl. RFA #697).  In contrast, similarly situated Caucasians received <u>raises</u> upon their promotions.  As a result, Wright was paid between six and eight thousand dollars less annually than Caucasian PRMs.  (RW St.

¶¶ 144-49; compare R10383 and R20011).  Defendants have not
offered a non-discriminatory explanation for Wright's treatment.

Again, defendants have asserted fair arguments as to a
number of the positions put into issue by plaintiffs.  I do not
take the time to review all the positions now, for plaintiffs
will not be permitted to put a limitless number of positions into
issue at trial.  Rather, each plaintiff will be limited to a
reasonable number of positions, drawn from positions that were
the subject of discovery, which will have to be identified in
advance of trial.

### 4.   Retaliation

The legal standards applicable to retaliation claims
are set forth above.  The individual plaintiffs asserting
retaliation claims have submitted evidence from which a
reasonable jury could find all three elements: (1) plaintiffs
engaged in protected activity of which defendants were aware; (2)
plaintiffs were subjected to materially adverse consequences; and
(3) the existence of a causal connection between the protected
activity and the allegedly retaliatory action.

Each of the plaintiffs in question engaged in protected
activity.  For example, Brown sent a letter to Webster
complaining of discriminatory treatment by her supervisor.
Brown, Colon, Roman, and Walker filed EEOC charges.  Portlette
complained to Cafaro about a denial of a promotion.  Wright wrote
letters raising concerns about discrimination.

- 81 -

Each of the plaintiffs in question was subjected to material adverse employment actions -- or at least a reasonable jury could so find. Some were given negative evaluations. Some were denied promotions or raises or transfers. Some were disciplined. Two were allegedly banished to working in basements. A reasonable jury could find that these actions "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2006 WL 1698953, at *10 (June 22, 2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

A reasonable jury could also find, with respect to each plaintiff in question, a causal connection between the protected activity and the material adverse actions. The direct and circumstantial evidence in support of such a conclusion is discussed above, and includes, for example: Webster's comments to Brown that complaints were frowned upon; the timing and sequence of events; the conditioning of salary increases or transfers on the dropping of claims; the arguably vindictive nature of some of the actions taken after complaints were made; and the apparent general unreceptiveness of Parks to the filing of discrimination complaints. Again, here plaintiffs are also assisted by the Teamsters presumption.

Defendants' motion is denied in this respect as well.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Plaintiffs' claims of (i) discriminatory assignment of employees and allocation of funding and (ii) a racial hostile work environment are dismissed; their remaining claims survive.  The request to preclude plaintiffs' experts from testifying is denied, to the extent set forth above.  A pretrial conference will be held on October 13, 2006, at 2:00 p.m.

SO ORDERED.

Dated:     New York, New York
           September 15, 2006

DENNY CHIN
United States District Judge

## **APPEARANCES**

For Plaintiffs:

        BELDOCK LEVINE & HOFFMAN LLP
            By:  Cynthia Rollings, Esq.
               Jody L. Yetzer, Esq.
        99 Park Avenue
        New York, NY  10016

            - and -

        LEWIS M. STEEL, Esq.
        3 Park Avenue, 29th Floor
        New York, NY  10016

            - and -

        NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
            By:  Robert H. Stroup, Esq.
               Melissa S. Woods, Esq.
        99 Hudson Street, Suite 1600
        New York, NY  10013

For Defendants:

        MICHAEL A. CARDOZO, ESQ.
        Corporation Counsel of
         the City of New York
            By:  Barbara B. Butler, Esq.
               Kathleen M. Comfrey, Esq.
               Sherri R. Rosenberg, Esq.
        100 Church Street
        New York, NY  10007