UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ROBERT WRIGHT et al.,                    :

                    Plaintiffs,          :

        - against -                      :

HENRY J. STERN et al.,                   :

                    Defendants.          :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/15/08

**OPINION**

01 Civ. 4437 (DC)

**APPEARANCES:**   (See last page)

**CHIN, District Judge**

In this class action, plaintiffs allege that the New
York City Department of Parks and Recreation ("Parks") engaged in
a pattern and practice of discrimination against African-American
and Hispanic employees and a pattern and practice of retaliation
against employees who attempted to oppose the discriminatory
practices.  Plaintiffs -- eleven African-American and Hispanic
current and former employees of Parks -- sue on their own behalf
as well as on behalf of similarly situated individuals.

Following nearly seven years of litigation in this
Court -- and some ten years of litigation dating back to the
investigation that led to the filing of administrative charges
with the United States Equal Employment Opportunity Commission in
March 1999 -- the parties entered into a settlement agreement
(the "Agreement"), subject to approval by the Court.  The parties
now seek approval of the Agreement, as required by Rule 23(e) of
the Federal Rules of Civil Procedure.

Out of some 3,500 class members, a small number -- thirteen -- have objected to the Agreement, and an even smaller number -- three -- have opted out so that they may pursue their own remedies. I have carefully considered the objections, but ultimately I am convinced that the proposed settlement is fair, reasonable, and adequate. A settlement is a compromise; it achieves a measure of success for both sides, and it eliminates the risks that accompany continued litigation, including the risk that a trial would result in no recovery at all. The City of New York (the "City") has defended this case passionately, and it would continue to do so if the settlement were not approved. The Agreement will result in extensive and concrete equitable relief and it also provides for the payment of some $11.869 million to eligible class members. There is simply no assurance that more years of litigation would result in any greater recovery. The Agreement is hereby approved.

**BACKGROUND**

**A.    Summary of the Facts**

The facts are set forth in detail in the Court's decision granting plaintiff's motion to certify this case as a class action, see Wright v. Stern, No. 01 Civ. 4437 (DC), 2003 WL 21543539 (S.D.N.Y. July 9, 2003) ("Wright I"), and in the Court's opinion granting in part and denying in part the City's motion for summary judgment, see Wright v. Stern, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) ("Wright II"). For purposes of the instant motion, the facts may be summarized as follows:

Parks is responsible for the care of more than 4,000 City properties, including parklands, playgrounds, public beaches, ball fields, swimming pools, recreational areas, senior citizen centers, golf courses, ice skating rinks, tennis courts, and more than 600,000 street trees. <u>Wright II</u>, 450 F. Supp. 2d at 345. During the relevant time period, at any given time, Parks employed approximately 3,400 to 5,000 full-time, year-round employees, and an additional 3,000 to 7,000 employees who worked on a seasonal basis only. <u>Id.</u> Between January 1, 1997, and December 31, 2003, Parks employed a total of 6,295 full-time, year-round employees, of whom approximately 2,124 (33.7%) were African-American and 1,163 (18.5%) were Hispanic. <u>Id.</u> at 346. Parks employees were subject to both the civil service structure and the union contracts in place at the time. <u>Id.</u>

As summarized in <u>Wright II</u>, plaintiffs have presented substantial evidence of discrimination against African-American and Hispanic Parks employees in promotions and pay, including statistical evidence, anecdotal evidence, comments betraying a discriminatory animus, and evidence of disparate treatment. <u>See</u> <u>id.</u> at 347-55. For example, the statistics show that in 2000, 92.9% of Parks employees earning an annual salary of less than $20,000 were African-American or Hispanic, while only 20.7% of Parks employees earning an annual salary of between $60,000 and $70,000 were African-American or Hispanic. Indeed, only 13.3% of Parks employees earning more than $70,000 annually were African-American or Hispanic. <u>Id.</u> at 347. In addition, the statistics

-3-

show that, controlling for job title, class members were paid between $16.44 and $32.59 less than Caucasian employees on a bi-weekly basis between 1997 and 2003.  Id.  Without controlling for job title, the disparity was much greater:  class members were paid between $283.25 and $364.09 less than Caucasians on a bi-weekly basis over the same time period.  Id.  Plaintiffs also presented substantial evidence that class members suffered retaliation when they complained of discrimination.  See id. at 355-57.

The City has steadfastly denied that it engaged in any discrimination or retaliation against African-American and Hispanic Parks employees.

**B.    Prior Proceedings**

Plaintiffs commenced this lawsuit almost precisely seven years ago, on May 24, 2001.  On June 19, 2002, the United States filed an action against the City as well, alleging a pattern and practice of racial and national origin discrimination by Parks in promotions.

On July 9, 2003, I certified the instant case as a class action.  See Wright I.

On June 8, 2005, the United States and the City entered into a consent decree, whereby the City agreed to implement certain personnel practices.

Plaintiffs and the City engaged in extensive discovery, under the supervision of Magistrate Judge Michael Dolinger.  The parties exchanged tens of thousands of documents and took

-4-

approximately 100 depositions. (Jt. Mem. at 4).[1] Plaintiffs engaged three expert witnesses, who conducted statistical and other analyses and produced substantial reports.

The City filed a motion for summary judgment, one prong of which sought to strike plaintiffs' expert reports and to preclude their experts' testimony. The motion papers were voluminous. In Wright II, I denied the application to preclude the expert reports and testimony, 450 F. Supp. 2d at 358-63, and I granted in part and denied in part the motion for summary judgment, id. at 363-79. I dismissed plaintiffs' claims of (i) discrimination in the assignment of employees and the allocation of funding and (ii) a racial hostile work environment. I denied the motion for summary judgment as to plaintiffs' promotion, pay, and retaliation claims. See id. at 378.

Following my ruling on the summary judgment motion, I had discussions with the parties about trial. The parties disagreed in some respects on how the trial should be conducted, but they agreed that there should be at least two stages. One side suggested that the trial be divided into three stages: (1) an initial liability phase on the class pattern and practice and

---

[1] "Jt. Mem." refers to the Joint Memorandum submitted by both plaintiffs and the City in support of their motion for preliminary approval of the Agreement. "Jt. Decl." refers to the Joint Declaration dated May 8, 2008 submitted by Cynthia Rollings, Lewis M. Steel, and Robert H. Stroup in support of plaintiffs' request for approval of the Agreement. "Comfrey Decl." refers to the declaration of Kathleen M. Comfrey in support of the City's request for approval of the Agreement. "Tr." refers to the transcript of the fairness hearing held on May 12, 2008.

disparate impact claims; (2) the individual claims of the eleven names plaintiffs; and (3) the claims of the remaining class members.  The parties were estimating as much as one year for the trial of the first stage alone.  I scheduled trial of the first stage to commence on November 5, 2007.  (<u>See</u> Jt. Decl. ¶ 47; Jt. Mem. at 4).

## C.    **The Settlement Negotiations**

The settlement negotiations began in December of 2006, when the parties agreed to mediation before former Magistrate Judge Kathleen A. Roberts.  (<u>See</u> Jt. Mem. at 2).  Over the course of the next twelve months, the parties met with Judge Roberts some twenty-five times.  (<u>Id.</u>).  With Judge Roberts's able assistance, the parties were able to agree on most of the issues, including monetary relief.  (Jt. Decl. ¶ 6).

In November 2007, the parties reported that they still had not been able to agree on several issues relating to injunctive relief.  In light of the progress the parties had made in settlement discussions, however, I adjourned the trial and met with the parties myself several times to mediate the open items. By the end of November 2007, the parties essentially reached agreement on all remaining items -- with the exception of attorneys' fees.  (<u>Id.</u> ¶¶ 6-7).

From the outset of settlement discussions, the parties had agreed to refrain from discussing attorneys' fees and costs until after they had settled in principle all claims for injunctive and monetary relief.  (<u>Id.</u> ¶¶ 7, 79; Comfrey Decl. ¶

-6-

2).  The City reviewed plaintiffs' counsel's time and disbursements records, and I met with the parties several more times to mediate the fees and costs.  (Jt. Decl. ¶ 8; Comfrey Decl. ¶ 3).  The parties reached an agreement in principle on attorneys' fees and costs in late January 2008.  (Jt. Decl. ¶ 8).

The parties agreed on the final language of the Agreement on February 25, 2008.  (<u>Id.</u> ¶ 8).

**D.  <u>The Agreement</u>**

I preliminarily approved the Agreement on February 26, 2008, and scheduled the fairness hearing for May 12, 2008, with objections and opt-outs to be submitted by May 2, 2008.  (<u>Id.</u> ¶ 10).

The Agreement contains both injunctive and monetary relief.  For example, in terms of equitable relief, it enjoins Parks and its agents and employees from "unlawfully discriminating against any employee based on race, color or national origin with respect to salary, compensation, or in making compensation decisions."  (Agreement § IV(C)(1)).  It enjoins Parks and its agents and employees "from retaliating against any person" for asserting claims of race, color, or national origin discrimination or opposing such discriminatory practices.  (<u>Id.</u> § IV(C)(2)).  It requires Parks to establish a five-person advisory committee to address discrimination and retaliation concerns; three of the five members must be full-time African-American and/or Hispanic Parks employees.  (<u>Id.</u> § IV(D)(1)).

-7-

The Agreement requires Parks to provide training to
employees who conduct interviews to fill job vacancies, and it
requires Parks to adopt certain procedures intended to make the
promotion process more objective.  (Id. § V(A)).  It requires
Parks to conduct an annual "adverse impact study" of the
selections for certain job titles to ascertain the selection
rates for African-American and Hispanic candidates versus
Caucasian candidates.  (Id. § V(C)(1)).  It requires Parks to
establish a training program to develop future managers.  (Id. §
VI(A)).  It requires Parks to adjust the salaries for certain
jobs in the recreation area, where plaintiffs believed
discrimination against class members was particularly prevalent.
(Id. § VII; see Tr. 6).  It requires Parks to adopt a post-
complaint follow-up procedure to determine whether employees
complaining of discrimination have been subjected to retaliation.
(Agreement § VIII(B)).

In terms of monetary relief, the Agreement provides for
the City to pay $11,869,856.25 in settlement of all monetary
claims.  The bulk of the funds will be divided among three funds:
a "promotion fund" ($4,951,013.88); a "pay fund" ($5,804,886.12);
and a "retaliation fund" ($563,956.25).  (Id. § X(A)).
Plaintiffs' counsel estimates that these amounts will result in
payments of approximately 50 cents on the dollar for the
estimated damages on the promotion and retaliation claims and
roughly 40 cents on the dollar on the pay claims.  (Tr. 7).  The
remainder of the settlement funds will be paid as "service

-8-

awards" of $50,000 each to the eleven named plaintiffs, as
compensation for the services they provided to the class and the
inconvenience, pain, and suffering they suffered as a consequence
of having been a named plaintiff in the case. (Agreement §
X(A)(4)). The named plaintiffs will also share in any of the
three funds for which they are eligible (id.), and five of the
named plaintiffs will also receive salary adjustments (id. § IX).

Eligible class members who have a valid promotion, pay,
and/or retaliation claim will share in the corresponding fund or
funds. (Id. § X(F)). For the promotion and retaliation funds,
all eligible class members will share equally, and if all
eligible class members participate (id. § X(F)(1), (3)), each
class member eligible for the promotion fund will receive
approximately $1,900 and each class member eligible for the
retaliation fund will receive approximately $5,500. (Tr. 31).
Payments from the pay fund will be based on calculations using
the regression analyses performed by the labor economists, and
eligible class members with a pay claim will receive an amount
ranging from a minimum of $1,000 to as much as approximately
$65,000. (Agreement § X(F)(2); Tr. 8, 31).

The Agreement also provides that the City will pay to
plaintiffs' counsel attorneys' fees of $8 million and litigation
expenses (including expert witness fees) of $999,999.79. (Id. §
XVIII). When the parties started their discussion of attorneys'
fees and costs, plaintiffs requested fees of $11.2 million, based
on their lodestar calculations (number of hours x hourly rates),

and $1.2 million in disbursements.  (Tr. 12; Jt. Decl. ¶ 76).[2]
The City disputed the reasonableness of these amounts, and the
negotiations described above resulted in a substantial
compromise.  In addition, these amounts do not include an
additional approximately 2,000 hours plaintiffs' counsel expended
in the settlement process, as they had agreed at the outset of
mediation not to seek fees for their time spent in settlement
negotiations.  (Tr. 12-13; Jt. Decl. ¶ 80).

Finally, it should be noted that the statistical
patterns of disparity that existed prior to 2004 -- that
plaintiffs contend were the result of discrimination -- no longer
existed after 2004, and anecdotally more class members seemed to
be getting promotions in recent years.  (Tr. 14, 36).  No doubt
this lawsuit helped bring about these changes.

**E.**   **Notice to the Class and the Fairness Hearing**

Notice of the proposed settlement, the fairness
hearing, and the process for objecting and opting-out were mailed
to the approximately 3,500 members of the class.  (Jt. Decl. ¶¶
11, 12).  In addition, notice was published in four newspapers;
the NAACP Legal Defense Fund held a press conference on February
27, 2008 (which generated newspaper articles in the New York
major newspapers as well as The Chief and the District Council 37
("DC37") newspaper); class counsel met with the DC37 local unions

---

[2]     Each of the three sets of lawyers has submitted a
declaration with attachments setting forth their credentials and
experience and showing the hours they expended and the services
they provided.  (See Jt. Decl. ¶ 78 & accompanying declarations).

to explain the settlement; and class counsel held four meetings directly with class members to explain the settlement.  (Id.). Accordingly, adequate notice of the Agreement, the fairness hearing, and the procedures for objecting and opting out were given to the class.  (See id.).

Thirteen objections and three opt-outs were filed. These are discussed below.

The fairness hearing was held on May 12, 2008.  A number of class members, including objectors and at least one opt-out, appeared.  They were given a chance to be heard.  I inquired of the parties whether they objected to my giving the objectors an opportunity to opt-out if I overruled the objections and approved the settlement.  Class counsel had no objection. Defense counsel did not believe the City would have an objection, but asked for some time to confirm.  (Tr. 32-33).  At the conclusion of the hearing, I reserved decision on the motion to approve the Agreement.  By letter dated May 13, 2008, the City advised that it would not object to giving the thirteen objectors a limited extension of time to opt-out.

## DISCUSSION

### A.    Applicable Law

Under Rule 23(e) of the Federal Rules of Civil Procedure, a settlement of a class action requires approval of the court.  Fed. R. Civ. P. 23(e).  The court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a

"product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000); see Fed. R. Civ. P. 23(e)(2). This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005) (citation omitted), cert. denied, 125 S. Ct. 2277 (2005). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Id. (quoting Manual for Complex Litigation, Third § 30.42 (1995)).

Rule 23(e) does not set forth the factors a court is to consider in determining whether an agreement is fair, reasonable, and adequate. In this circuit, courts traditionally have considered the following factors, commonly referred to as the Grinnell factors: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation. City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on

other grounds, <u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43
(2d Cir. 2000); <u>see also</u> <u>Wal-Mart Stores</u>, 396 F.3d at 117-19
(applying <u>Grinnell</u> factors to determine that settlement agreement
was fair).  The weight given to any particular factor will vary
based on the facts and circumstances of the case.  Charles Alan
Wright, Arthur R. Miller, & Mary Kay Kane, 7B <u>Federal Practice
and Procedure: Civil</u> § 1797.1, at 77 (3d ed. 2005).

     Public policy, of course, favors settlement.  <u>Wal-Mart</u>,
396 F.3d at 116-17; <u>accord</u> <u>Williams v. First Nat'l Bank</u>, 216 U.S.
582, 595 (1910) ("Compromises of disputed claims are favored by
the courts."); <u>TBK Partners, Ltd. v. W. Union Corp.</u>, 675 F.2d
456, 461 (2d Cir. 1982) (noting "the paramount policy of
encouraging settlements").  Consequently, when evaluating a
settlement agreement, the court is not to substitute its judgment
for that of the parties, nor is it to turn consideration of the
adequacy of the settlement "into a trial or a rehearsal of the
trial."  <u>Grinnell Corp.</u>, 495 F.2d at 462.  "Rather, the Court's
responsibility is to reach an intelligent and objective opinion
of the probabilities of ultimate success should the claims be
litigated and to form an educated estimate of the complexity,
expense and likely duration of such litigation and all other
factors relevant to a full and fair assessment of the wisdom of
the proposed compromise."  <u>In re Met. Life Derivative Litig.</u>, 935
F. Supp. 286, 292 (S.D.N.Y. 1996) (quoting <u>Lewis v. Newman</u>, 59
F.R.D. 525, 527-28 (S.D.N.Y. 1973)) (internal quotation marks and
ellipses omitted).

**B.  Application**

I consider the "settlement's terms" and the "negotiating process" in the context of discussing the Grinnell factors.  As the Second Circuit did in Wal-Mart Stores, I combine certain of the factors and discuss them together.  See 396 F.3d at 118 (combining fourth, fifth, and sixth factors), 119 (combining eighth and ninth factors).  I then consider the reasonableness of the Agreement's provisions for attorneys' fees and costs.

**1.  The Grinnell Factors**

**a.  Complexity, Expense, and Likely
      Duration of Litigation**

The claims in this case present difficult and complex legal and factual questions.  The parties have compiled a massive body of evidence and the parties had estimated that the first stage would take as many as twelve months to try, even though the first stage would have addressed only the class pattern and practice and disparate impact claims.  The individual claims of the eleven named plaintiffs and the claims of thousands of other class members as well would have remained.  And assuming plaintiffs prevailed on liability, the remedial phase would have been complex and protracted as well.  Accordingly, this factor strongly favors settlement.  See Wal-Mart, 396 F.3d at 118 (likelihood of three-month trial involving complex antitrust claims favored settlement); Marisol A., 185 F.R.D. at 162-63

(likelihood of five-month trial involving more than one hundred fact witnesses and twelve experts favored settlement).

      b.   **Reaction of the Class**

Of some 3,500 class members, only thirteen filed objections and only three opted out.  The thirteen objections were filed by:

> Saifulllah As-Salaam
> Walter R. Boyd
> Diane Cleveland-Goins
> Arnyce Foster
> Porfirio E. Lantigua R.
> Robert McClain
> Dennis Moody
> Leon Negron
> Dyanne Norris
> Al Peterson
> Edwin Rosario
> George Scott
> Ruben Vargas

I carefully reviewed all of the written objections, and I listened to those who spoke at the hearing.  Substantially for the reasons set forth in plaintiffs' joint declaration, the objections are overruled.  While I am sympathetic to some of the concerns raised, the objections simply do not undermine "the wisdom of the proposed compromise."  For example:

      ●   Two objectors complained that they had not been selected to be among the named plaintiffs.  Class counsel could not, of course, include every class member who wanted to be a named plaintiff, and the law imposes no obligation on them to do so.  Eleven named plaintiffs was certainly sufficient.

      ●   Some objectors objected to the payment of service awards to the named plaintiffs.  Such payments, however, are

permitted by the case law.  The amount here -- $50,000 -- was reasonable in light of the burdens imposed by participating as a named party in litigation that spanned some ten years.  See, e.g., Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving service awards to two named plaintiffs of $300,000 each in two-year lawsuit); Beck v. Boeing Co., No. 00-CV-301P, at 4 (W.D. Wa. Oct. 8, 2004) (order approving award of $100,000 each to twelve named plaintiffs in four-year lawsuit); Roberts v. Texaco, Inc., 979 F. Supp. 185, 188-89 (S.D.N.Y. 1997) (approving awards of $85,000 and $50,000 to named plaintiffs in three-year lawsuit).

- Some objectors complained that the City and individual administrators are not being held accountable, and that the Agreement contains no admission of liability.  Of course, defendants rarely -- if ever -- admit liability or wrongdoing when they settle a case.  Moreover, with the exception of former Commissioner Henry J. Stern and current Commissioner Adrian Benepe, other administrators and supervisors are not named as defendants in the case.  Finally, the fact that the City has agreed, after some ten years of litigation, to significant injunctive relief and the payment of more than $20 million is surely an acknowledgment that there was exposure and that it was in the best interest of the City to compromise plaintiffs' claims of discrimination and retaliation.  The statistical and anecdotal evidence shows that this lawsuit has already had a significant effect on the disparities that led to its filing.

● Several objectors complained that the amounts being paid out of the settlement funds were inadequate to compensate for the discrimination encountered over many years (23 years in one case, 24 years in another case, 30 years in another) of employment. These complaints are understandable, but the fact is that the law provides only a limited remedy for this kind of historical discrimination. (See Tr. 8-11). As plaintiffs' counsel acknowledges, "given the statute of limitations, it is not possible to compensate persons for injustices dating prior to May 24, 1997." (Jt. Decl. ¶ 20). But this lawsuit and the Agreement will go a long way toward addressing discrimination and retaliation in the future. Moreover, any class member who believed he or she has a strong case and is likely to recover greater damages had the right to opt out.

● Some objectors complained that for the promotion and retaliation funds all eligible class members were to receive the same amount and suggested that the amounts should have been based on seniority. In view of the statute of limitations, the number of eligible class members, and the difficulties in making individual determinations, the decision to allocate the funds equally among all eligible class members was reasonable. (Jt. Decl. ¶¶ 20-21).

The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate.

### c.    **Stage of Proceedings and Discovery Completed**

Discovery has been completed; defendants filed their summary judgment motion (which included a request under Daubert to strike plaintiffs' expert testimony); the Court has ruled on the motion in a lengthy decision; and a trial date had been set. Hence, both the Court and the parties have a substantial basis for evaluating the strengths and weaknesses of plaintiffs' claims and defendants' defenses.  "[F]ew unknowns" remained.  Wal-Mart, 396 F.3d at 118.

The extensive discovery included the exchange of tens of thousands of documents and the taking of some 100 depositions. The litigation was hard-fought and the settlement negotiations, as discussed above, were extended and were supervised by an experienced private mediator (and former magistrate judge) as well as by the Court.  See Wal-Mart, 396 F.3d at 117 (noting that district court held that "'there could not be any better evidence of procedural integrity' than the aggressive litigation spanning nearly a decade and the impassioned settlement negotiations that produced an agreement on the brink of trial").

There was no collusion.  To the contrary, the litigation was passionately contested, and the Agreement was the result of extensive arm's-length negotiations between experienced, capable counsel after meaningful discovery.

The lawyers for both sides are to be highly commended. Class counsel, led by Robert H. Stroup of the NAACP Legal Defense Fund (who joined the case in 2003), Cynthia Rollings of Beldock

Levine & Hoffman LLP, and Lewis M. Steel, are highly respected
and experienced members of the civil rights bar.  The City was
more than capably represented by Kathleen M. Comfrey and other
members of the Corporation Counsel's office as well as by Sherri
Rosenberg of the Parks legal department.  With these dedicated
advocates involved, I have no doubt that both sides were
represented zealously and effectively and I have no hesitation as
to the procedural integrity of the settlement process.  This
factor strongly favors approval of the Agreement.

> ### d.  Risks of Establishing Liability and Damages and Maintaining the Class

While plaintiffs had amassed a substantial body of
evidence to prove their claims, establishing liability was by no
means certain.  Notably, some of the objecting class members had
lost when they pursued individual claims of discrimination.
Recently, the Supreme Court granted certiorari in <u>Crawford v.
Metropolitan Government of Nashville and Davidson County</u>, 128 S.
Ct. 1118 (2008), a case that raises questions regarding the scope
of Title VII's protections against retaliation for filing an
internal claim of discrimination.  (Jt. Decl. ¶ 46; Tr. 11).  A
decision by the Supreme Court in <u>Crawford</u> holding that Title
VII's anti-retaliation provisions did not reach internal
complaints would surely have an adverse impact on some of the
class members' retaliation claims in this case.

Even assuming plaintiffs were to establish liability at
trial, substantial risks would have existed as to the scope of

any relief.  The City argued that the Supreme Court's recent decision in Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162 (2007), altered the legal standard for pay claims.  (Jt. Decl. ¶ 46; Tr. 10-11).

There was also a substantial risk that the case would not have been maintained as a class action through trial.  I certified this case as a class action in 2003.  See Wright I. Since then, however, the law in this Circuit on class certification has changed.  In In re Initial Public Offering Securities Litigation (In re IPO Sec. Litig.), 471 F.3d 24, 40-42 (2d Cir. 2006), the Second Circuit overruled the holding in Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999), which had permitted courts to certify a class based merely on "some showing" of compliance with the Rule 23 requirements. Instead, in the IPO case, the Second Circuit held that "a district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."  471 F.3d at 40.  District courts may no longer "accept plaintiffs' [class] allegations as true and refrain from conducting an examination of the merits when determining the propriety of class certification," as I did here.  See Wright I, 2003 WL 21543539, at *4-5.  Rather, district courts are now required to make such factual determinations as are necessary to deciding whether all of Rule 23's requirements have been met, even if that means making factual determinations on Rule 23 issues that overlap with the merits.  IPO Sec. Litig., 471 F.3d at 41-42.

In light of the change in the law, there was a substantial risk that, absent a settlement, the City would have moved to de-certify the class. During the course of the litigation, the City had suggested they might move to de-certify or re-define the class. (Jt. Decl. ¶ 46). There was certainly some risk that, under the new Rule 23 standards, I would have been persuaded to grant a de-certification motion if one were made. See, e.g., McCracken v. Best Buy Stores L.P., 248 F.R.D. 162 (S.D.N.Y. 2008) (Chin, J.) (denying class certification motion).

These factors strongly favor approval of the settlement.

### e. Defendants' Ability To Withstand Greater Judgment

This factor does not favor settlement, as the City has the ability to withstand a greater judgment.

### f. Reasonableness of Settlement in Light of Best Possible Recovery and Attendant Risks of Litigation

Plaintiffs' counsel estimates that the recoveries on the promotion and retaliation funds will be roughly 50% of the damages that could have been recovered (in terms of economic losses) and that the recoveries on the pay fund would be roughly 40% of the damages that could have been recovered had the case proceeded to trial and plaintiffs prevailed. Recovery of these percentages, then, is more than reasonable in light of the attendant risks of litigation and the burdens and delay of

proceeding to trial, as discussed above.  While some class
members will be recovering only small amounts, this is largely a
result of the limitations of the law, the nature of promotion and
pay claims (which often do not result in substantial recoveries
for the types of jobs in question), and the absence of a
continuing violation claim in the case.  (See Tr. 9).  Moreover,
in view of the difficulty in getting the City to reach this
point, there is little reason to believe that further settlement
negotiations would result in any additional settlement funds.
See Wal-Mart, 396 F.3d at 119.

These factors strongly favor approval.

In short, the Grinnell factors overwhelmingly support
approval of the Agreement.

## 2. **Attorneys' Fees and Costs**

The Agreement provides for the payment to counsel of $8
million in fees and the reimbursement of $999,999.79 in costs
(including expert fees).  These amounts are fair and reasonable.
They cover some ten years of time and expenses.  These negotiated
amounts reflect a substantial reduction from counsel's initial
demands, and do not include the 2,000 hours spent negotiating the
settlement and drafting the Agreement.  Moreover, in view of
quality of the representation provided by class counsel and the
depth of their commitment, the fees and costs are well-deserved.

## CONCLUSION

For the reasons set forth above, the Agreement is
approved as fair, reasonable, and adequate.  The objections to

the Agreement are overruled. The Court will sign the Agreement forthwith.

The thirteen individuals who submitted written objections prior to the fairness hearing (and only these thirteen individuals) are hereby granted an extension of time, until June 2, 2008, to opt out of this case. If they wish to opt out, they must submit a separate piece of paper in accordance with the opt-out procedures set forth in the notice to the class. The opt-out request must be in writing and it must be signed and dated; it must contain the statement set forth in the class notice; and it must be mailed to the Claims Administrator at the address set forth in the class notice, no later than June 2, 2008. Any of the thirteen who does not submit an opt-out request by June 2, 2008 will not be permitted to opt out.

Dated:    May 15, 2008
          New York, New York

_____
DENNY CHIN
United States District Judge

**APPEARANCES**

For Plaintiffs:

        BELDOCK LEVINE & HOFFMAN LLP
             By:  Cynthia Rollings, Esq.
                  Jody L. Yetzer, Esq.
                  Myron Beldock, Esq.
        99 Park Avenue
        New York, NY  10016

             - and -

        LEWIS M. STEEL, Esq.
        3 Park Avenue, 29th Floor
        New York, NY  10016

             - and -

        NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
             By:  Robert H. Stroup, Esq.
                  Melissa S. Woods, Esq.
        99 Hudson Street, Suite 1600
        New York, NY  10013


For Defendants:

        MICHAEL A. CARDOZO, ESQ.
        Corporation Counsel of
         the City of New York
             By:  Kathleen M. Comfrey, Esq.
        100 Church Street
        New York, NY  10007

             - and -

        SHERRI R. ROSENBERG, Esq.
        ALESSANDRO G. OLIVIERI, Esq.
        NYC Department of Parks & Recreation
        830 Fifth Avenue
        New York, NY  10065